266 F.2d 33
 Nancy Corinne DYER and J. Raymond Dyer, Petitioners, Cyrus
L. Day, Intervenor-Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent, Union
Electric Company, Intervenor-Respondent.
 No. 15989.
 United States Court of Appeals Eighth Circuit.
 April 10, 1959, Rehearing Denied May 11, 1959.
 
 J. Raymond Dyer, St. Louis, Mo., for petitioners and intervenor-petitioner.
 Deniel J. McCauley, Jr., Associate Gen. Counsel, S.E.C., Washington, D.C. (Thomas G. Meeker, Gen. Counsel, Aaron Levy and Solomon B. Freedman, Sp. Counsel, and Mahlon M. Frankhauser, Atty., Washington, D.C., on the brief), for respondent.
 Robert J. Keefe, St. Louis, Mo. (William H. Ferrell and Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, Mo., on the brief), for intervenor-respondent.
 Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.
 JOHNSEN, Circuit Judge.
 
 
 1
 This proceeding is one under 15 U.S.C.A. 79x(a), to review two orders of the Securities and Exchange Commission, entered on March 21 and 25, 1958, allowing a declaration, filed by the management of Union Electric Company, of St. Louis, Missouri, to become effective, as a basis for the solicitation of proxies from stockholders, for the annual meeting of the corporation, to be held on April 21, 1958. Five series of amendments were made to the declaration before the Commission gave its final approval, four by management voluntarily and the fifth by requirement of the Commission as an approval condition.
 
 
 2
 We denied petitioner's request for a stay of the Commission's orders pending review, so that the stockholders meeting was held as scheduled.
 
 
 3
 Petitioners, who are daughter and father, are the holders of 350 shares of common stock in Union Electric, out of a total of 11 1/4 million voting shares, 10,500,000 common and 750,000 preferred. Another stockholder, the owner of 100 shares, has been permitted to join them in this proceeding as an intervenor-petitioner.
 
 
 4
 Union Electric is a holding company registered under the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. 79a et seq. It has aligned itself with the Commission's position here as an intervenor-respondent.
 
 
 5
 Difficulties and disputes had previously existed between petitioners and the management of Union Electric in relation to the annual stockholders meetings of both 1956 and 1957. In October, 1957, the Commission, on the basis of 12(e) of the Act, 15 U.S.C.A. 79l(e), issued a notice and order, prohibiting the management of Union Electric and all other persons from soliciting proxies for the 1958 meeting, unless a declaration of the proxy material intended to be used was filed with the Commission under 12(e) of the Act and under Rule U-62 of its implementing regulations, 17 CFR 250.62, and unless the declaration was thereafter by order of the Commission permitted to become effective.
 
 
 6
 Petitioners meanwhile had submitted to management, under Rule X-14A-8 of the Commission's regulations, 17 CFR 240.14a-8, eleven proposals of resolutions and amendments to by-laws, with notice of their intention to present all of these for action at the annual meeting. Management thereafter filed its declaration with the Commission, containing its proposed proxy-solicitation statement and proxy form. It included therein, for voting on at the meeting, four of petitioner's proposals, indicating that they had orginated from petitioners, setting out the supporting statement of petitioners as to each, and making expression of its own opposition thereto-- all as provided for by Rule X-14A-8(b), supra.
 
 
 7
 To the declaration and the amendments thereto, as referred to above, petitioners filed a total of 35 objections. The Commission issued an order for hearing, under its Rule U-62(e), supra, and a hearing was held. Petitioners were allowed to participate, in accordance with Rule 17(c) of the Commission's Rules of Practice, 15 U.S.C.A. They (through the father, who is a lawyer) engaged in cross-examining witnesses, offering evidence, filing briefs, submitting proposed findings and conclusions, taking exceptions to the recommended findings and conclusions of the Division of Corporate Regulation (or Staff) of the Commission, and making oral argument. The Commission thereafter entered the orders which are here sought to be reviewed.
 
 
 8
 Numerous attacks are made by the petition for review on the Commission's proceedings, rulings, findings, conclusions and orders. These have been further compounded and expanded, by six separate briefs which petitioners have filed, in a use to the utmost of the privilege, which we perhaps too liberally accorded them, of making full expression of their alleged grievances. The result has been that contentions have been multiplied and refined to the point of creating artificiality and almost obsessive pitch.
 
 
 9
 In petitioner's approach to and treatment of the situation on this basis, they have, we think, allowed their vision to become obscured as to the nature of what is involved and the extent of our authority in relation thereto. The Commission was here engaged in a purely administrative task. It was simply exercising regulatory judgment in respect to the propriety, adequacy, practicality, and fairness of proxy-solicitation material generally as between management and stockholders (not as to petitioners alone), and particularly in relation to the application of its own rules and regulations for promoting and affording generally (in borrowed phrase from S.E.C. v. Transamerica Corp., 3 Cir., 163 F.2d 511, 518) 'fair opportunity for the operation of corporate suffrage'.
 
 
 10
 The Commission had a right to deal with the proxy material and the 35 objections of petitioners therto, in the light cast upon the particular situation by the filings and the evidence, on the basis of natural application of its regulations; unarbitrary administrative judgment as to matters extending beyond the reach or effectiveness of the regulations; and attribution in relation thereto of such intelligence as ordinary stockholders could be presumed to have in their receipt of proxy-solicitation material.
 
 
 11
 Petitioners have gone the length of arguing that some of the Commission's regulations should abstractly be regarded as failing to promote, or as being insufficient or ineffective to carry out, the general purpose and policy of 12(e) of the Act, to have proxy materials and solicitations afford a fair opportunity for the operation of corporate suffrage. Here, it must be borne in mind that 12(e) is only generally declarative of proxy-solicitation policy, but not definitive or prescriptive in its terms, and that it entrusts to the Commission's judgment entirely the matter of what form and extent of general or specific commands or prohibitions may be necessary or appropriate to help give reality and substance to the policy. It contains express authorization of 'such rules and regulations or orders as the Commission deems necessary or appropriate in the public interest or for the protection of investors or consumers or to prevent the circumvention of the provisions of this chapter, or the rules, regulations or orders thereunder'.
 
 
 12
 This grant of legislative or regulatory power, in its relation to proxy solicitation, requires general judicial acceptance of any properly adopted rule, regulation or general order, unless it undebatably is unrelated to, non-facilitative of, or in conflict with, the policy of the Act, or unless it otherwise is so arbitrary or burdensome as to be legally unreasonable.
 
 
 13
 It is, however, not for a court to say policy-wise, as petitioners would have us do, that it feels that some relevant rule, regulation or general order as to proxy material and solicitation does not go far enough or is not sufficiently liberal in its provisions, to entitle it to general application. Equally, it is a matter fundamentally for the Commission's judgment whether its rules, regulations or general orders are adequate to promote the policy of the Act in application to the facts of some particular situation.
 
 
 14
 Only where the facts are such as to reach beyond the rules, regulations and general orders of the Commission, so that some clear evil or violation of the policy of the Act is in no way touched by their application, is there any basis at all for a court to say that the Commission has not gone far enough in the particular situation. And this basis must represent, not room for difference in judgment, but lack of room legally for any sound difference as to the need to have gone further.
 
 
 15
 Similarly, as to orders not of general character but made in relation to the facts of a particular porxy-solicitation situation, with directions going beyond the rules and regulations, must a court accept the Commission's judgment, unless it can be said that what has been done is without any rational basis on all the elements involved.
 
 
 16
 Hence, as we have indicated, neither as to a regulation nor as to a special order in a proxy situation, does it matter that there may be a judicial persuasion that a different and better judgment ought to have been exercised, if the Commission's view or judgment on necessity and appropriateness constitutes a permissible one. And any consideration of the permissibility of the Commission's view, as to resting on a rational basis, must requiredly take into account the factors of the plenary scope of authority and judgment granted the Commission in the proxy field and the administrative experience or expertness which is impliedly entitled to have its play in resolving the question of need or appropriateness.
 
 
 17
 The narrow margin thus legislatively intended to exist for judicial review has been carried even into the incidence of the Commission's determinations of questions of specific fact in a situation, which are dependent entirely upon the evidence produced before it, by the provision of the Act that 'The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive'. 15 U.S.C.A. 79x(a).
 
 
 18
 On these bases, we turn to a more specific discussion of some of petitioners' contentions.
 
 I.
 
 19
 Petitioners, as their first ground of attack, seek to have us set aside the Commission's approval of management's proxy form, because of a provision therein to the effect that, unless otherwise indicated by the stockholders, the proxy, if signed and returned, would be voted for the proposal made by management to increase the amount of authorized common stock of the corporation, as set out in the proxy material and form, and against the proposals made by petitioners, similarly set out.
 
 
 20
 It is argued that to allow such a blanket-form of proxy authority to be solicited is contrary to public policy, as not affording a sufficient opportunity for 'stockholder democracy', as being conducive to 'management oligarchy', and as representing 'SEC czarism'. Rule X-14A-4(b) of the Commission's regulations authorizes the inclusion of such a provision in a proxy form.
 
 
 21
 The statement made by the Commission in its opinion sufficiently demonstrates the rational and relevant basis existing for the regulation and the order here made, so that we have no right to touch the situation in this respect. The Commission said: 'Management's proxy is in the usual form which authorizes the holder of the proxy to vote for the election of directors, provides means whereby a stockholder may direct a vote for or against the management's proposal and each of the four proposals of Dyer which management has included pursuant to Rule X-14A-8, and states that 'This proxy will be voted as directed on the foregoing proposals, but if no such direction is specified, this proxy will be voted for the amendment to the Articles of Incorporation (management's proposal) and against Stockholder Proposals 1, 2, 3 and 4'. Dyer objects to this last statement on the ground that it deprives a stockholder of the authority to abstain from voting on one or more of the proposals. Rule X-14A-4 specifically permits the statement to which Dyer objects, and we find nothing in the circumstances of this case to require its exclusion here. It may also be noted that a stockholder wishing to abstain from having his shares voted on any matter may do so by crossing out the proviso to which Dyer objects or by other appropriate deletion or assertion'.
 
 
 22
 Relatedly, the Commission further pointed out that testimony in the record by the Secretary of Union Electric showed that management had in the past received proxies with lines run through proposals therein, or with language crossed out, so that authority was left only for voting for the election of directors, and that such proxies had always been counted only for the election of directors.
 
 
 23
 Neither abstractly, nor on the facts of the immediate situation, is there any basis for us to hold that the regulation is unrelated to, non-facilitative of, or in conflict with the policy of the Act; or that it is arbitrary; or that its application here leaves wholly untouched some clear evil or violation of the Act. Petitioners have not demonstrated that application of the regulation here does not afford a fair opportunity for the operation of corporate suffrage, within the presumable intelligence of ordinary stockholders.
 
 II.
 
 24
 Petitioners next contend that the Commission improperly permitted management to make solicitation of and receive proxies from broker-members of the New York Stock Exchange in a manner violative of the rules of the Exchange. Union Electric's stock is listed on the Exchange.
 
 
 25
 The stock to which petitioners' contention relates stood of record in the names of the brokers as owners, but was being held by them for beneficial owners. Under Missouri law, the brokers had a right in such situation to vote the stock or give proxies therefor. 17 V.A.M.S. 351.245, 351.250.
 
 
 26
 Under Rules 451 and 452 of the New York Stock Exchange, however, broker members of the Exchange thus holding stock are not at liberty to excute a proxy therefor without first seeking instructions from the beneficial owners. But where no instructions are received by a specified date, after request, the broker is entitled to give a proxy, except as to matters involving a 'contest' or pertaining to an 'authorization for a merger', or on 'any matter which might substantially affect the rights or privileges of such stock'. CCH New York Stock Exchange Guide, Pars. 2451 and 2452.
 
 
 27
 It is argued that it was improper for the Commission to allow management to have its proxy solicitation of such brokers and the proxy form executed by the latter include any authorization with respect to the proposal of management to increase the capital stock of the corporation, because that was a matter which petitioners were opposing and as to which in their view there accordingly existed a 'contest'. Corollarily, it also is contended that the Commission should have required management to make its proxy material show that petitioners opposed the stock-increase proposal.
 
 
 28
 The Commission overruled the objection and contention of petitioners, on the ground that the term 'contest' was not used in the Exchange rules in the broad sense in which petitioners were seeking to have it applied but was by other language in the rules given qualification to mean only matters which were the subject of countersolicitation of proxies, or which consisted of proposals made by a stockholder which were being opposed by management.
 
 
 29
 In the enumeration of the situations in which a member organization could give a proxy without customer instructions, one of the conditions stated in the Exchange rules was that 'the person signing the proxy has no knowledge of any contest as to the action to be taken at the meeting'. In another paragraph there was a statement of similar general nature that 'After a contest has developed no further proxies should be given except at the direction of beneficial owners'.
 
 
 30
 There expressions, standing alone, did not, of course, make the term 'contest one of limited application or special meaning. But the rules went on to add apparent qualification to the expressions, by making a specific enumeration of the situations in which 'a member organization may not give a proxy to vote without instructions from beneficial owners', and in this specification the prohibition imposed, as related to the use of the term 'contest', was only as to any matter which 'is the subject of countersolicitation, or is part of a proposal made by a stockholder which is being opposed by management (i.e. a contest)'. Similarly, in a paragraph dealing with the question of discretionary proxies which had been previously given, where a matter of 'contest' should subsequently arise, the direction made was confined to 'Where * * * countersolicitation develops at a later date thereby creating a 'contest' * * *.' CCH N.Y. Stk. Ex. Guide, Pars. 2452.11(2) and 2452.13.
 
 
 31
 On the qualification and import appearing to be given the term 'contest' by these specifications, we can see no room for us to overthrow the Commission's conclusion and ruling. There is no evidence that the Exchange or its members have made any such application of the term 'contest' as petitioners contend for, or any different interpretation of the qualifications contained in the rules than the one which the Commission reasonably did.
 
 
 32
 The comment might also pertinently be added, in relation to the policy of fair opportunity being afforded for the operation of corporate suffrage, that a use or application of the term 'contest in the broad sense for which petitioners contend, would mean that much, if not most, of such broker-held stock could practicably be kept from exercising any voice in the affairs of the corporation, through the simple expedient of an individual dissident stockholder (of which there would perhaps always be one) giving notice to the Exchange or its individual members, in connection with every stockholder meeting, that he was going to oppose everything that management favored.
 
 
 33
 The record shows that there were approximately 4,000,000 shares of Union Electric which were broker-held, though perhaps not all by members of the New York Stock Exchange. In the confidence and authority generally allowed to exist by customers in favor of their brokers as to such stock, many of the customers would hardly bother to give instructions as to proxies merely because the broker asked them to do so. Thus it would be logical that the Exchange rules should, as they appear to do, impose only limited and not total restriction on the right of broker vote or proxy-giving, where customers failed to give instructions, and not attempt to keep the stock in such a situation from being utterly without any voice in the affairs of the corporation and in the possible affecting of the value of the stock itself, because of the mere fact that some dissident and vocal stockholder existed, who wanted to oppose everything that management did or suggested.
 
 III.
 
 34
 Petitioners' next contention attacks the Commission's approval of management's exclusion of 7 of the 11 proposals made by them, from its proxy declaration. As has been indicated, management included 4 of petitioners' proposals in its proxy-solicitation material, for voting on at the meeting-- one involving a by-law on proxy ballots; another relating to lobbying expenditures; a third concerning limitations on advertising expenditures; and the fourth creating a stockholder relations office.
 
 
 35
 Of the 7 excluded proposals, three had been included in management's proxy declaration for the 1957 annual meeting and on submission had received less than 3% of the stockholder vote cast thereon at that meeting. The Commission sustained management's rejection of these three proposals as to its 1958 proxy declaration, on the basis of Rule X-14A-8(c)(4)(i) of the Commission's regulations, 17 CFR 240.14a-8(c)(4)(i), which provides that '* * * management may omit a proposal (of a security holder) and any statement in support thereof from its proxy statement under any of the following circumstances: * * * (4) If substantially the same proposal has previously been submitted to security holders, in management's proxy statement and form of proxy relating to any annual or special meeting of security holders held within the preceding five calendar years, it may be omitted from the management's proxy material relating to any meeting of security holders held within the three calendar years after the latest such previous submission, provided that-- (i) If the proposal was submitted at only one meeting during such preceding period, it received less than 3% of the total number of votes cast in regard thereto; * * *'.
 
 
 36
 It is to be borne in mind that Rule X-14A-8 affords a privilege, which does not otherwise ordinarily exist in favor of stockholders. Necessarily, the Commission could properly impose reasonable conditions and limitations on the scope and manner of enjoyment of the privilege, in relation to the other elements of holding stockholder meetings and conducting corporate affairs. There clearly is no basis for us reviewingly to say that either the regulation or its application to the present situation was an improper and unwarranted act on the part of the Commission. Relatedly, it may be observed that the exclusion of petitioners' proposals from management's proxy material did not, of course, in any way affect petitioners' independent right to make a proxy solicitation of their own or to bring up the excluded proposals from the floor of the meeting in accordance with by-law provisions.
 
 
 37
 Petitioners argue, however, that the Commission had no right to apply Rule X-14A-8(c)(4)(i) to the three proposals rejected at the 1957 meeting, because the propriety of the Commission's order approving management's proxy material and proxy form has not yet been finally judicially determined.
 
 
 38
 A petition for review was filed by petitioners as to the Commission's proceedings, rulings, findings, conclusions and order on management's proxy-solicitation material for the 1957 meeting, just as they have done as to the 1958 meeting. We, as here, denied a request for a stay of the Commission's order as to that meeting, and the 1957 meeting was held as scheduled. On subsequent hearing of petitioners' review proceeding, the division of the Court to which the matter was assigned dismissed the petition as having become moot by reason of the fact that the meeting to which the proxy-solicitation controversy related had then been held. Dyer v. Securities and Exchange Commission, 8 Cir., 251 F.2d 512. Petitioners filed a petition for a writ of certiorari to this dismissal of the review proceeding for mootness, and that petition is now pending in the Supreme Court. (The question whether the holding of the 1958 meeting should similarly be regarded as having rendered the present petition for review moot was permitted by us to be reopened and argued and is dealt with, post, in subdivision X of this opinion.)
 
 
 39
 Regardless of the fact that the pendency of the petition for certiorari has left the question of the propriety of the Commission's 1957 order not finally judicially resolved, we think that the Commission was legally warranted in treating the order as valid and having effect, and as thus affording a proper basis, under Rule X-14-A-8(c)(4)(i), for excluding from the 1958 proxy declaration the three proposals acted on and rejected at the 1957 meeting. This is because of the provision of 15 U.S.C.A. 79x(b), which allows Commission orders to have legal operation, despite the pendency of proceedings for review, unless a stay of their operation is 'specifically ordered'. Regardless of what might be the ultimate judicial result as to the 1957 review proceeding, the Commission's treatment of the situation here was valid and proper administrative action in relation to the consideration required of it as to the immediate controversy.
 
 IV.
 
 40
 Of the four other excluded proposals of petitioners, the contents of two were identical, the only difference between them being that one was drawn in the form of a general resolution and the other in the form of an amendment to the by-laws. Both provided that 'false or deceptive advertising by the company, and false or deceptive communications by the company to its stockholders, be outlawed, and that the officers and directors of the company be divested of all authority to expend corporate funds for either of these purposes'.
 
 
 41
 It was the Commission's view that management was warranted in not submitting these proposals in its proxy materials, because of the provision of Rule X-14A-8(c)(5) of the Commission's regulations that a proposal by a security holder may be omitted by management from its proxy statement and proxy form, '(5) If the proposal consists of a recommendation or request that the management take action with respect to a matter relating to the conduct of the ordinary business operations of the issuer'.
 
 
 42
 The Commission's Staff, similarly as management, in its recommendation of findings and conclusions to the Commission, regarded the proposals as not adding anything to what management was already bound to do as a matter of business ethics and of prohibition under the false-advertising statute of Missouri. The Commission, as indicated in its order, felt additionally, on the basis of the reasons contained in a written opinion by Union Electric's general counsel to the corporation, copy of which was made a part of the record, that, as a matter of fact, the officers and directors did not now have any legal authority, between themselves and the company, to expend corporate funds for such form of advertising and communications as the proposals were directed against, so that there was nothing to 'outlaw' or to divest 'authority' in respect to. Thus, the Commission apparently felt that the proposals would legally have no effect, and all that they actually could serve to do would be to convey the implication to stockholders that such authority presently existed and was being exercised.
 
 
 43
 The statement which petitioners submitted to management in support of the proposals asserted that Union Electric had been guilty of expending money for false advertising and false communications, particularly in 1956. The advertisements and communications which petitioners had in mind consisted of statements on the part of management, defending its conduct in relation to a lobbying fee paid by the corporation in trying to get a certain bill through the Illinois Legislature-- a matter which had notoriously been the subject of considerable publicity, investigation and public reaction. The Commission did not pass upon the merits of petitioners' charges, because it regarded the materials which petitioners attempted to offer in evidence on the question of alleged falsity as being too remote in nature.
 
 
 44
 We think there would be room to differ with the Commission's judgment in respect to the propriety and desirability of permissibly allowing these two proposals to be submitted as a matter of stockholder reaction, expression and direction on policy, in view of the cloud created by the lobbying-fee incidents and the differing public discussion apparently stirred up by the explanation made of them. We are not prepared to say, however, that the Commission's views and rulings are devoid of rational basis, so as to entitle us to set aside its order in this respect. Any disagreement with the Commission's order would, we think, represent in the situation simply a difference in possible persuasion and judgment as to the relative weight of the varying elements and considerations capable of being involved. Since the particular question is one wholly of administrative and not quasi-judicial approach and perspective, we would not, within the principles stated at the start of the opinion, be warranted in usurpingly substituting our judgment for that of the Commission, by engaging in a choice, on weight, against those relevant factors which the Commission thought sufficiently justified an exclusion of the proposals.
 
 V.
 
 45
 The other two excluded proposals of petitioners were attempts to amend the by-laws to accord certain rights as to the stock held by minors in their own name.
 
 
 46
 One of the proposals was 'that the By-Laws be amended so as to provide that the company accord to the father and/or mother, or guardian, of a minor stockholder (whichever is legally entitled thereto) all rights incident to stock ownership that it accords stockholders who have reached their majority'. The other proposal was one to allow minors to give proxies for the stock standing in their name.
 
 
 47
 The Commission held that management was entitled to exclude these two proposals as not being in harmony with Missouri law.
 
 
 48
 In State ex rel. Dyer v. Union Electric Company, Mo.App., 309 S.W.2d 649, to which petitioners were parties, the St. Louis Court of Appeals specifically held that under the law of Missouri a minor (in that case a Union Electric stockholder) was without legal capacity to appoint an agent. The Missouri Supreme Court denied petitioners' request for a transfer of the case to it in review. There is accordingly no need to waste time on petitioners' argument that we ought to ignore this decision, make a different declaration, and set aside the Commission's holding.
 
 
 49
 Similarly, in respect to the proposal to have the by-laws accord rights to a father or mother or guardian of a minor stockholder, 26 V.A.M.S. 475.025 allows a father or mother as natural guardian of a minor to exercise the powers of a court-appointed guardian over such property only of the minor as 'is derived' from them. It does not accord them such power generally, as the proposal of petitioners sought to have the by-laws recognize in their favor. Again, on the powers of a court-appointed guardian as to corporate stock, the statutes of Missouri provide that 'no guardian * * * shall be entitled * * * to vote shares * * * without a transfer of such shares into his name'. 17 V.A.M.S. 351.260(2).
 
 
 50
 Thus, the attack here upon the Commission's views and holding as to these two proposals manifestly is artificial and frivolous.
 
 VI.
 
 51
 Petitioners make a number of contentions in relation to management's proposal, as set out in its proxy material, to increase the authorized common stock of the corporation from 10,500,000 to 12,000,000 shares.
 
 
 52
 The argue that the Commission should have required financial statements to be included in the proxy material as to the stock increase. The Commission pointed out that, while its rules provide that financial statements must be included in proxy statements under certain circumstances, Item 15(c) of Schedule 14A, covering 'Information Required in Proxy Statement', 17 CFR 240.14A, Item 15(c), specifically provides that 'Such financial statements * * * are not deemed material in cases involving the authorization or issuance of common stock, otherwise than in exchnage'. The Commission added that there was 'nothing unusual in connection with the company's proposal to increase its authorized stock' which called for the situation to be taken out of the application of the regulation. Here again, with no demonstration of need and only expression of petitioners' own philosophy, the contention must be regarded as artificial and captious.
 
 
 53
 Another contention made is that management was improperly permitted to state in its proxy material that a majority vote was necessary to make amendment of the articles of incorporation to provide for the proposed stock increase. Petitioners assert that a two-thirds plurality was required. As the Commission pointed out, the articles of incorporation contained a provision that certain sections thereof should be subject to amendment only by a two-thirds affirmative vote, but the section as to the amount of authorized common stock was not one of these. In the absence of a provision otherwise, the corporation laws of Missouri leave a charter provision as to the amount of common stock subject to amendment by majority vote. 17 V.A.M.S. 351.090, subd. 1(3). Union Electric's by-laws also provide that such an amendment may be made by majority vote.
 
 
 54
 Petitioners further complain because they were denied the privilege of making a statement in management's declaration in opposition to the proposed stock increase. The Commission adequately answered this objection and contention by its statement that 'The Commission's proxy rules contain no provision requiring management to include such opposition statements by stockholders in its own proxy material and no special circumstances have been shown to justify making an exception in this case'.
 
 VII.
 
 55
 Another grievance of petitioners is that the statement made by management in its proxy material against two of their four proposals which management had included was in excess of 100 words and that the Commission refused to require the statements to be reduced to that length. Rule X-14A-8(b) of the Commission's regulations requires that, where management includes in its proxy material, for vote at a meeting, a proposal by a security holder to which it is opposed, it must also include 'a statement of the security holder in not more than 100 words in support of the proposal'. The regulations, however, impose no similar limitation upon the number of words which management may insert in its own proxy material in opposition.
 
 
 56
 The Commission said: 'The 100-word limitation is a reasonable qualification of the right which the Regulation gives a stockholder to have included in the management's proxy material, at the expense of the corporation, a statement in support of his own proposal. The same considerations do not apply to statements made by management in its own material'.
 
 
 57
 Whatever substance might be capable of existing in a stockholder's complaint against a refusal of the Commission to depart from the regulation and to afford him more than 100 words in some extreme or complicated situation, he could hardly have a legitimate grievance where his 100-word allowance had afforded him all the opportunity that he had demonstrated that he needed for statement. Here, petitioners' argument amounts to nothing more than that, as an abstract difference in number of words, the Commission was required to limit the statement of management to the same length as that of petitioners. This is hardly substance on which to ask judicial review.
 
 VIII.
 
 58
 Petitioners contend that the Commission improperly approved amendment 5 made by management to its proxy material, pursuant to the requirement of the Commission's conditional order of March 21, 1958, thereby allowing management's proxy declaration and proxy form to become effective, without giving them an opportunity for further objection and hearing. They allege that the requirement of due process was thereby violated.
 
 
 59
 The conditional order of the Commission of March 21, 1958, imposed two requirements upon management as a basis for allowing its proxy statement and proxy form to become effective.
 
 
 60
 Management's declaration, as filed with the Commission, had stated, on the basis of the provisions of its by-laws, that a vote of a majority of the outstanding shares was necessary to make amendment of the articles of incorporation to increase the amount of the common stock. Petitioners argued that under the Missouri statute a majority of the shares voted, if a quorum was present, was sufficient, unless the articles of incorporation contained a different provision, which they here did not, if the Commission was correct in its ruling, as discussed in subdivision VI hereof, supra. The by-law provision, on which management relied as against the statute, had been adopted prior to the enactment of the statute. To rid itself of this collateral legal dispute, the Commission made its conditional order of approval provide as follows: 'Under the circumstances we are of the opinion that if the management statement retains the present statement regarding the vote required, it should indicate that Dyer has raised the question regarding the vote required for amendment, but that in the opinion of the company counsel the by-law provision is valid under Missouri law'.
 
 
 61
 The Commission further directed that as to petitioners' proposal No. 2, on lobbying expenditures, included by management in its proxy declaration for voting on at the meeting, the statement of management that substantially the same proposal had received less than 27% of the 'requisite' vote at the 1957 meeting should similarly be appropriately revised in relation to the difference in views between Dyer and company counsel on what vote was necessary to effect amendments.
 
 
 62
 Management thereafter made amendments to its declaration, which the Commission approved as satisfying the requirements imposed by it, and on the basis of which it entered its order of March 25, 1958, allowing the proxy statement and proxy form of management to become effective for solicitation purposes. But the amendments did not satisfy petitioners. They wanted to file more objections, and because the effectuating order was entered without waiting to receive any further objections from them, they contend that the order is without due process and so is invalid.
 
 
 63
 The Commission had the right to determine whether the amendments satisfied the requirements imposed by it as a condition for allowing the declaration to become effective, without waiting to see whether they satisfied petitioners-- and particularly since it had indicated what the substance of the amendment was to be, so that the only question could be the matter of form.
 
 
 64
 It required no granting of opportunity for petitioners to be heard from on whether the Commission ought to be satisfied as to the form of expression made on these wholly collateral matters in their relation to a stockholder's giving of proxy. With the full opportunity which had been accorded for hearing on the merits of the things involved in and affected by the proxy solicitation, there could exist no question of due process as to the administratively concluding order made in relation to the form of the expression allowed on this collateral aspect. Beyond this, the argument which petitioners here make against the expression allowed is, we think, purely captious and hypercritical and utterly without any substance. It impresses as amounting simply to a desire not to pass up any opportunity to engage in more objections.
 
 IX.
 
 65
 We are still a long way from the end of the trail of petitioners' objections and contentions. This opinion could be carried to several times its present length, in similar vein and with corresponding result to the discussion which has preceded. The extent and nature of the things argued, which progressively reach into even still thinner soil, neither merit nor warrant us in so prolonging our opinion. It has already been allowed to go beyond the point of any useful purpose that can legally be served, in a matter which increasingly impresses that it is more permeated with the fertility of crusase than the objectivity of advocacy. We have, however, responsibly engaged in the laborious task of ferreting out, in the jungle of expression before us, all of petitioners' scattered contentions and considering them, so as to be certain that there is nothing that entitles the Commission's orders to be set aside. Within the scope and function of our review authority as to the character of the proceeding involved, there is nothing which the Commission has done or failed to do that entitles petitoners in any respect to have the Commission's orders reversed.
 
 X.
 
 66
 The only thing therefore of which we shall remainingly make discussion is the question of mootness, as referred to above.
 
 
 67
 As has been noted, the division of the Court, before which was heard petitioners' proceeding to review the order made by the Commission on the proxy solicitation for the 1957 annual meeting, dismissed that proceeding as having become moot by virtue of the meeting having by that time been held. Dyer v. Securities and Exchange Commission, 8 Cir., 251 F.2d 512. That case is now pending in the Supreme Court on petition for a writ of certiorari, so that it would not be proper for us to make any expression in relation to it. What we say here is therefore intended to have application simply to the situation before us. We shall accordingly not engage in any direct examination of what the questions were which were sought to be presented for review in the previous case, as a matter of either similarity or distinction.
 
 
 68
 Doubtless, there can be questions of such a nature or incidence in relation to a proxy solicitation that their administrative significance can become moot from a holding of the stockholders meeting. But we are satisfied that questions too can exist, as in the present situation, which are of such a character or consequence that they cannot properly be regarded as having become fixed or dissolved or otherwise rendered inoperative by the holding of the meeting.
 
 
 69
 Thus, in example here, where proposals made by petitioners had been permitted to be included in the proxy-solicitation material, and where a defeat of them at the meeting could, under the regulations of the Commission, as above referred to, impose a limitation upon the right of petitioners and other stockholders of have them again so submitted, the question whether the Commission had allowed the proxies used against them to be solicited on an improper basis would be one of continuing effect.
 
 
 70
 Beyond this, it is apparent, from the three-year history which has up to this point preceded, that the fight of petitioners against the management of Union Electric is one that is going to have an unremitting and indefinite duration. In this situation, not merely from the standpoint of petitioners, but as well from the standpoint of the Commission, the corporation, and the other stockholders, it is desirable to get the questions here involved leveled off, so that the controversy can begin to have some settling in its course.
 
 
 71
 Relatedly, and as a matter of preventing legal frustration, it is evident that, unless the situation is so dealt with, it will be impossible practicably for any affected party (whether petitioners, management, or the other stockholders) ever to obtain on a proxy-solicitation question the judicial review provided for by the statute, so as to be able to get such a situation acceptedly settled or legally stabilized. Experience in the two situations which have now been before us shows that it is physically impossible, in a proxy-solicitation controversy of such character and length as these two have been, to get the proceedings for review perfected and subject to hearing and disposition, between the time of the action of the Commission and the date of the corporation's annual meeting, unless a stay is granted, for which there is no occasion in the ordinary situation.
 
 
 72
 In still wider horizon, there also is a recognized right of judicial discretion, in the public interest, to deal with the validity or propriety of administrative regulations and actions, where they have justiciably been brought into court, even though they may perhaps have ceased thereafter to have a direct significance in the particular situation. This does not mean that a court is required or has the right to engage in a decision of this character in every such situation; but it is judicially entitled to do so where it appears that some general benefit may public-wise, or in relation to the possibility of further similar litigation, come from having it established whether the administrative agency has acted within or without its authority. One of the things, among others, that could tend to prompt such a consideration here is petitioners' repeated charge that the members of the Commission are holding-company-minded and have been biased and prejudiced against petitioners-- a charge for which we find not the slightest basis in the record, and the cloud of which the Commission is entitled to have here lifted.
 
 
 73
 Ample authority for the views expressed above exists in such cases as Okin v. S.E.C., 2 Cir., 145 F.2d 913, 914; South Carolina Public Service Authority v. Federal Power Commission, 4 Cir., 170 F.2d 948, 951-952; S.E.C. v. Transamerica Corp., 3 Cir., 163 F.2d 511; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 334-335; Boise City Irrigation & Land Co. v. Clark, 9 Cir., 131 F. 415, 419; Gay Union Corp. v. Wallace, 71 App.D.C. 382, 112 F.2d 192, 195; Walling v. James V. Reuter, Inc., 321 U.S. 671, 674-675, 64 S.Ct. 826, 828, 88 L.Ed. 1001; Southern Pacific Terminal Company v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310. See also 'Federal Jurisdiction to Decide Moot Cases', 94 Pa.L.R. 125; 'Administrative Law-- Questions 'Moot' on Appeal', 22 Ind.L.J. 235; 'Public Interest as Ground for Refusal to Dismiss on Appeal where Question has Become Moot', 132 A.L.R. 1185, Annotation.
 
 
 74
 On all the considerations indicated, we think that the present situation is entitled to be disposed of on its merits, and we have so dealt with it. It may be added that both the Commission and Union Electric also have urged that the situation involved should not be treated as having become moot.
 
 XI.
 
 75
 On the merits of all the questions and contentions raised by petitioners, including those generally referred to as well as those specifically discussed, the orders of the Commission are entitled to be and are hereby affirmed.