**Bonnie KOPPELL, by her father, et al.,
Plaintiffs,**

v.

**Sol LEVINE, individually and in his capacity as principal of John Dewey High School, et al., Defendants.**

No. 72–C–527.

United States District Court,
E. D. New York.

Aug. 10, 1972.

New York Civil Liberties Union, New York City, for plaintiffs; Alan H. Lev-

ine, Steven M. Tullberg, New York City, of counsel.

J. Lee Rankin, Corporation Counsel of City of New York, New York City, for defendants; Mary P. Bass, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Pursuant to section 1983 of title 42 of the United States Code, plaintiffs seek three forms of relief: (1) an injunction against educational authorities preventing distribution of a student literary magazine on the premises of a public high school; (2) a declaration that the system of prior review of student literature employed by defendants violates the United States Constitution; and (3) damages and attorneys' fees. Preliminary relief was granted by oral order from the bench at the evidentiary hearing on the application for a preliminary injunction. Considerations related to mootness require denying a declaratory judgment. The claim for damages and attorneys' fees must be denied on the merits.

## II.

During the relevant period plaintiffs Bonnie Koppell and Donald Margulies were students at John Dewey High School and served as editors of STREAMS OF CONSCIENCE, an annual collection of student essays and poetry. Mr. Margulies has since graduated and Ms. Koppell is now editor-in-chief.

In the academic year 1970–71 the material included in STREAMS OF CONSCIENCE was selected from fellow students' work by the editors; their faculty advisor and the chairman of the English department approved these decisions. Duplication of approximately 1000 copies of the magazine was completed by June, 1971, but distribution was postponed until the fall term because there was insufficient time to collate most of the copies.

At the beginning of the fall term Sol Levine, the high school principal, impounded the undistributed copies of the magazine. On October 21, 1971, meeting with the editorial staff, he announced that he found the document obscene. A story written by Mr. Margulies employed four letter words as part of the vocabulary of an adolescent youth and contained a description of a movie scene where a couple "fell into bed."

On November 12, 1971 plaintiffs appealed the principal's decision by letter to Jacob B. Zack, Assistant Superintendent of High Schools for New York City. A hearing was held on November 30, 1971. Written arguments were submitted and letters exchanged with respect to the delay in Mr. Zack's decision. An appeal dated January 19, 1972 to the Chancellor of the New York City schools was denied on January 26, 1972 on the grounds that Mr. Zack had not yet rendered his decision. In a decision dated January 27, 1972, Mr. Zack upheld the action of the principal. Plaintiffs promptly renewed their appeal to the Chancellor on February 7, 1972, and received an adverse decision on March 6, 1972. On March 7, 1972, plaintiffs appealed to Isaiah Robinson, President of the Board of Education of the City of New York. The Board upheld the earlier decision in an opinion dated April 5, 1972.

## III.

Proceedings in this court were commenced by order to show cause on April 26, 1972. The court held an immediate evidentiary hearing and made oral factual determinations favorable to plaintiffs with respect to three critical issues: (1) lack of obscenity; (2) absence of any acceptable pedagogical reasons for suppression; and (3) unacceptable delays in administrative resolution of the dispute.

The definition of obscenity falling outside first amendment protection may vary according to the group to

whom material is directed or from whom it is withheld. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Even regarding minors, however, constitutionally permissible censorship based on obscenity must be premised on a rational finding of harmfulness to the group in question. *Id.* at 641, 88 S.Ct. 1274.

In *Ginsberg* the court upheld a New York penal statute prohibiting the sale to minors of specified types of material and paraphrasing the Supreme Court's three pronged test—appeal to prurient interest, patently offensive to community standards and without redeeming social importance. Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The statute reads in part as follows:

"(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

(iii) is utterly without redeeming social importance for minors." N.Y. Penal Law § 484–h, McKinney's Consol.Laws, c. 40.

The prevailing interpretation has been that *Ginsberg* mandated only that the courts "more broadly construe the traditional definition of obscenity when applied to cases involving . . . minors." Sullivan v. Houston Independent School District, 333 F.Supp. 1149, 1162–1163 (S.D.Tex.1971). *See also* Note, The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 124–130 (1968). For the purposes of this decision we may accept the New York penal provision as providing an acceptable definition of obscenity in cases of minors.

■ Based on its examination of STREAMS OF CONSCIENCE, the testimony of expert witnesses, plaintiffs' testimony, and judicial notice, the court concluded that it was not obscene. The magazine contained no extended narrative tending to excite sexual desires or constituting a predominant appeal to prurient interest. The dialogue was the kind heard repeatedly by those who walk the street of our cities, use public conveyances and deal with youth in an open manner. It was not patently offensive to adult community standards for minors as evidenced by comparable material appearing in respected national periodicals and literature contained in the high school library. It was intended by the students involved to be a serious literary effort, and, especially with respect to Mr. Margulies, that intent was effected in a manner demonstrative of unusual talent. The entire literary project was of significant constructive social and educational importance for high school students.

■ Since not obscene for high school students, STREAMS OF CONSCIENCE could not be impounded without some overriding justification based on the principal's disciplinary and educational responsibilities. Whether such a reason for censorship would ever suffice is a matter not necessary for decision since no excuse other than a claim of obscenity has been tendered. The Supreme Court has unequivocally stated, in connection with the exercise of constitutionally protected forms of speech by students in the public schools, that administrative interference with first amendment rights will not be lightly countenanced:

"[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). The applicable test is whether school authorities might reasonably forecast "substantial disruption of or material interference with school activities". *Id.*

at 514, 89 S.Ct. at 740. There are no counterveiling circumstances in this case sufficient to overcome the public interest that students in public educational institutions be afforded "the widest latitude for free expression and debate consonant with the maintenance of order." Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 2341, 33 L.Ed.2d 266 (June 26, 1972).

The issue of whether a principal might properly exercise any greater degree of supervisory discretion in connection with publications bearing the school's name, or on which school funds were about to be expended or materials or facilities employed is not presented. *Cf.* Buckley v. Meng, 35 Misc.2d 467, 230 N.Y.S.2d 924 (1962); Danskin v. San Diego Unified School District, 28 Cal.2d 536, 171 P.2d 885 (1946). The name of the school did not appear on the publication, and expenditures involved in its duplication had already occurred. For the purposes of this litigation this literary magazine had the character of a private creation by the student editors.

■■ Citation of authority is hardly needed to support the proposition that the administrative delay of a full academic year in deciding whether this publication could be distributed is completely unacceptable. Any administrative determination and review procedure limiting free expression must be made almost immediately, not over a course of months or years, where prior censorship prevents publication. *See* Freedman v. Maryland, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971); Rowe v. Campbell Union High School District, No. 51060, N.D.Cal. (3-judge court), Memorandum and Order, Sept. 4, 1970, p. 2, fn. 1; Stacy v. Williams, 306 F.Supp. 963, 978 (D.Miss.1969) (3-judge court); Evergreen Review, Inc. v. Cahn, 230 F. Supp. 498, 503 (E.D.N.Y.1964) (3-judge court). This proposition is particularly important in the case of student publications since the tenure of a student editor is so short. *See* Rowe v. Campbell Union High School District, No. 51060, N.D.Cal. (3-judge court), Memorandum and Order, Sept. 4, 1970, p. 2, fn. 1. If there is to be any control over high school publications, the Board of Education must utilize more adequate procedures for prompt resolution of disputes.

Consistent with these findings, the court on April 28, 1972 directed defendants to return to plaintiffs the impounded copies of STREAMS OF CONSCIENCE and to permit the distribution of the magazine on school property in a way that did not substantially interfere with or disrupt school activities, providing the defendants could, if they wished, stamp each copy with a legend to the effect that the school assumed no responsibility for the contents. Defendants immediately complied with the order and took no appeal.

By motion filed June 14, 1972, plaintiffs have now asked for summary judgment on their pending claims for relief. We deal first with the request for a declaratory judgment that the system of prior review employed by defendants is unconstitutional since it presents the more difficult legal questions.

### IV.

The initial inquiry is whether there exists a justiciable controversy sufficient to support the jurisdiction of a federal court. U. S. Constitution art. III, § 2. "For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite." United Public Workers of America v. Mitchell, 330 U. S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947), quoting Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 443, 58 S.Ct. 678, 82 L.Ed. 936 (1938). *See also* Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

■ The history of the infelicitous delay in obtaining a final administrative determination of the status of STREAMS OF CONSCIENCE from school authorities is relevant to the re-

quest for declaratory relief only as it bears upon the likelihood of similar future occurrences. Although section 2201 of title 28 of the United States Code authorizes the court to declare the rights of the parties with respect to possible future disagreements in certain circumstances, it permits no relief which is not "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality *to warrant the issuance of a declaratory judgment."* Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Here, there remains little, *if any,* life to the controversy regarding the actual procedures employed in reviewing STREAMS OF CONSCIENCE. The plaintiff Donald Margulies, who has graduated, retains no legally cognizable interest in the system of prior review of student literature at John Dewey High School. To the extent that plaintiff Bonnie Koppell might engage in further literary efforts in the school and again become involved with defendants' review procedures, she would have such an interest. The first possibility appears substantial; the second—that her future activities will again result in administrative action—is highly uncertain. Whether this constitutes a potential controversy of sufficient immediacy and reality to support jurisdiction is a close question. The court concludes that it does. *Compare* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) *with* Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). *See also* Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971).

## V.

The fact that a suit for a declaratory judgment may satisfy the constitutional elements of justiciability, however, does not necessitate a decision on the merits. Section 2201 is permissive, rather than mandatory. The provision "confers a discretion on the courts rather than an absolute right upon the litigant." Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). That discretion is to be exercised in accordance with traditional principles of equity. Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

As the Supreme Court has observed, the relevant federal authorities are clouded by some ambiguity and disagreement as to whether particular instances of judicial abstention are occasioned by the constitutional requirements of justiciability or equitable discretion. Flast v. Cohen, 392 U.S. 83, 94–97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *See, e. g.,* Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207, 1216–1220 (1970) (Leventhal, J., concurring in the result). Two guiding principles emerge from the case law. First, "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). Second, abstention from unnecessary decisions of public import is intertwined with the doctrine of mootness as it has been developed by courts quite independent of jurisdictional requirements.

The instant issue is not moot and beyond the judicial power in the sense that it involves "abstract, hypothetical, academic, fictitious or dead issues." Borchard, Declaratory Judgments 183 (2d ed. 1941). *See* Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Wright, Law of Federal Courts,

35–36 (1970). But even if it were moot in the sense that the immediate relief sought had been obtained or could no longer be granted, courts will not necessarily be precluded from deciding the case. Judge Fuld has pointed out that an important consideration is whether the issue raised is "one of major importance" and "will arise again and again" and, for these reasons "one that invites immediate decision." Rosenbluth v. Finkelstein, 300 N.Y. 402, 404, 91 N.E.2d 581 (1950). *See also* East Meadow Community Concerts Ass'n v. Board of Educ. of Union Free School Dist. No. 3, County of Nassau, 18 N.Y.2d 129, 272 N.Y.S.2d 341, 219 N.E.2d 172 (1966); Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969); Southern Pacific Terminal Company v. Interstate Commerce Commission, 219 U.S. 498, 514–516, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Dyer v. Securities and Exchange Commission, 266 F.2d 33–47 (8th Cir. 1959); Sanders v. Wyman, 464 F.2d 488, 491 (2d Cir. 1972); Annot., Public Interest as ground for refusal to dismiss an appeal, where question has become moot, or dismissal is sought by one or both parties, 132 A.L.R. 1185 (1941). *Cf.* Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792 (1948); Fraenkel, The Impact of Mootness, 20 Syracuse L.Rev. 835 (1965); *but cf.* Logan v. West Orange-Cove Independent School District, 440 F.2d 1076 (5th Cir. 1971); Demby v. Wexler, 436 F.2d 570 (2d Cir. 1970).

The question posed is whether it is desirable to approach the limits of our constitutional authority to decide whether the defendants' prior review procedures are constitutional. The issue requires an inquiry into the effect of our failure to act on plaintiffs' first amendment freedoms as balanced against the several dangers associated with judicial action where the relevant issues are not yet crystalized in an adversarial setting.

## VI.

▮ The system of prior review provided in regulations issued by the Board of Education, pursuant to its authority under section 2590-g of New York's Education Law to prescribe and control conduct in the high schools in New York City, bears little resemblance to what occurred in relation to STREAMS OF CONSCIENCE. Paragraph 9 of Circular 104 of the Board of Education, entitled "Rights and Responsibilities of High School Students" and dated September 1970, does provide for review of the principal's actions, in turn, by the assistant superintendent in charge of high schools, the Chancellor and then the Board itself. Paragraph 4, however, reflects an applicable standard consistent with the teaching of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It declares New York City's "Students may exercise their constitutionally protected rights of free speech and assembly so long as they do not interfere with the operations of the regular school program." In addition, subdivision 43 of section 90 of the Board's by-laws, as amended November 5, 1970, provides that a decision at each step in the process of administrative review shall be reached within 15 working days. An affidavit submitted in this case by Isaiah Robinson, President of the Board of Education, describes the proceedings surrounding STREAMS OF CONSCIENCE as "not typical." Further, and of considerable importance, counsel for defendants has represented to the court that the existing 15-day limitation is being subjected to reconsideration and possible modification to shorten the period of possible delay.

Considering all the relevant circumstances, it is unlikely that plaintiff Bonnie Koppell will suffer any significant impediment to the exercise of her protected first amendment freedoms by reason of this court's failure to rule on the constitutionality of the school authorities' prior review procedures at this

time. The record in this case reveals no actual or threatened disciplinary action against plaintiffs, or any suggestion of such action in the future arising from a controversy similar to that involving STREAMS OF CONSCIENCE. *Cf.* Jacobs v. New York, 388 U.S. 431, 87 S.Ct. 2098, 18 L.Ed.2d 1294 (1967).

On the record before us, the school regulations in question may not be "justifiably attacked on their face as abridging free expression". Dombrowski v. Pfister, 380 U.S. 479, 489, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965). Although an adversary hearing is constitutionally required prior to a massive seizure of allegedly obscene material (A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 210–211, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964)), it is settled in this circuit that an administrative proceeding by school authorities will satisfy this requirement in the special context of a public secondary school. Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971). Unlike the situation in *Eisner*, where the questioned school regulation prohibiting unauthorized distribution of literature was held constitutionally deficient because it prescribed neither a definite time period within which review of submitted material was to be completed nor specified to whom and how material should be submitted for clearance, the Board's regulations clearly set out appeal procedures and time limitations.

Although it may be appropriate in some situations to allow a federal action to remain pending for a reasonable period to permit a final administrative determination by school authorities, this court would not hesitate to rule on the merits of both a substantive controversy and the applicable review procedure when sufficient delay or other defect in the school administrative procedure justified such action. *Compare* Holmes v. Danner, 191 F.Supp. 385 (Md.Ga.1960), *with* Westley v. Rossi, 305 F.Supp. 706, 712–713 (D.Minn.1969).

At this time, plaintiffs suffer from no impediment to their exercise of constitutionally protected speech similar to that which has occasioned the courts to lower the ordinary barriers to potentially premature adjudications in order to give constitutional "freedoms the necessary 'breathing space to survive.'" Walker v. City of Birmingham, 388 U.S. 307, 344, 87 S.Ct. 1824, 1844, 18 L.Ed.2d 1210 (1967) (Brennan, J., dissenting). *See generally* Note, The Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808 (1969).

## VII

Several reasons weigh heavily against an immediate decision on the constitutionality of the school authorities' present procedures for prior review of student literature. Regardless of characterization, the related concepts of justiciability, ripeness, standing and mootness, as developed by judicial decisions, evince a common theme regarding the undesirability of adjudications where some of the traditional elements of an adversary legal action may be absent or of diminished force. Central to these doctrines is the notion, expressed by Chief Justice Marshall with respect to the distinction between holding and dictum, that matters not really at issue between parties with specific, adverse interests are "seldom completely investigated." Cohens v. Virginia, 6 Wheat 264, 399, 19 U.S. 264, 399, 5 L.Ed. 257 (1821). Justice (then Professor) Frankfurter once observed, while perhaps overstating the position for emphasis, that the doctrine was of especial significance when there arose issues involving "the eternal conflict between the freedom of the individual and his control by society":

"The stuff of these contests are facts, and judgments upon facts. Every tendency to deal with them abstractly, to formulate them in terms of sterile legal questions, is bound to result in sterile conclusions unrelated to actualities." Frankfurter, A Note On Advisory Opinions, 37 Harv.L.Rev. 1002, 1002–03 (1924).

More recently the Supreme Court has suggested that questions "traditionally thought to be capable of judicial resolution" are those arising under circumstances where it is certain

> "that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor." Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1956, 20 L.Ed. 2d 947 (1968).

One commentator has usefully summarized the rationale for this approach as arising from five separate considerations. See Note, Judicial Determinations in Nonadversary Proceedings, 72 Harv.L.Rev. 723 (1959). First, the policy serves to narrow issues and make them manageable for the mechanics of adjudication. Second, narrowly presented questions are considered less likely to result in judgments which will circumscribe potentially valuable modes of social experimentation. Third, decisions reached in the traditonal adversarial setting are more readily accepted as dispositive of the issues involved, both by the parties and by society in general. Fourth, decisions so reached are more likely, in objective terms, to be correct. Fifth, the policy reflects a consensus that, at least where prejudice can be avoided, litigation in the courts should be the forum of last resort for the resolution of civil controversies. Since declaratory judgments, to varying degrees, sacrifice these principles, they are said to be justified only insofar as they relieve a party "of the need to take a significant step without knowledge of its possible consequences." Id. at 729.

Applying these principles to the facts of the instant case, the court concludes that they strongly disfavor a decision on the merits of the prior review procedures at this time. In view of the representation by counsel for the defendants that the present review procedures are under consideration, some possibility exists that the constitutional validity of the existing regulations will not be contested with the vigor that they otherwise would be.

Of even greater import, on the facts of this case, is the difficulty the court would confront in evaluating the reasonableness of the maximum time periods involved in the absence of an existing dispute. The school's regulations are concerned with, in addition to obscenity, avoidance of libel and defamation. What is a reasonable time period in which to require the school authorities to act may well be different in a case where sanctioning of material might lead to civil liability. And where, in a heterogeneous neighborhood, slurs of a racial or religious character might create or add to existing tensions, there might be room for time to allow for mediation as well as review. Reasonableness of the timing of the review procedure may vary according to the complexity of the task to be performed. A single poem or picture may be considered more quickly than a book. Literature which is to be distributed in an orderly fashion may raise less difficult problems than other forms of expression which may require the school authorities to weigh the possibility of disruption of school activities. To pass on the reasonableness of the maximum period allowed by current regulations would require the court to indulge in precarious predictions about all the kinds of controversies which could possibly arise.

The unique relationship between students and educators makes such speculation particularly unwise. As the court observed in *Eisner,*

> "It is to everyone's advantage that decisions with respect to the operation of local schools be made by local officials." Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971).

Recent years have evidenced considerable alteration, occasioned by legislation, judicial decisions and evolving social attitudes, of traditional assumptions concerning student rights and, more generally, the role that younger members of our society are to play. *See, e. g.,* U. S.

Constitution amend. XXVI; Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The development of those rights and adjustment to their consequences in the context of a public educational system presents problems of considerable complexity which have initiated thoughtful discussion from diverse sources. *See, e. g.,* New School for Social Research, Final Report: High School Principals Study Seminar (1969); New York State Commissioner of Education, Student Activism in the High Schools of New York State (1969); Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027 (1969); Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045 (1968). The local educational structure has been particularly subject to social pressures and stresses as well as structural changes during the past few years. *See, e. g.,* Campbell v. Board of Education, 310 F.Supp. 94, 95–98 (E.D.N.Y. 1970). Some latitude needs to be afforded school officials struggling in good faith to comprehend and then respond to a state of affairs foreign to the one that existed just a few years ago.

We can properly give time to local authorities to work out appropriate methods of dealing with first amendment questions. Premature straight-jacketing by the courts may abort sound and imaginative methods of dealing with the problem.

No useful purpose will be served, under the present facts of this case, by imposing an opinion of this court on current re-evaluation of an aspect of the relationship between students and school authorities where plaintiffs will not be prejudiced, the issues are not clearly defined and the educational authorities have not yet had a full opportunity to bring to the relevant questions the benefit of their expertise. The more advantageous course, in such circumstances, is to permit the administrative process, in the first instance, to "evolve procedures to meet needs as they arise." Richardson v. Wright, 405 U.S. 208, 209, 92 S. Ct. 788, 789, 31 L.Ed.2d 151 (1972).

### VIII.

There is no indication in the record of bad faith by defendants sufficient to justify a judgment for nominal punitive damages and attorneys' fees. *Compare* Shull v. Columbus Municipal Separate School District, 338 F.Supp. 1376 (N.D.Miss.1972) *with* Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970).

### IX.

Plaintiffs' motion for summary judgment with respect to declaratory judgment, nominal damages and attorneys' fees is denied. Plaintiffs, since they were forced to sue to obtain constitutional rights, are entitled to costs.

### X.

This memorandum and order is the final judgment of the court. See Rule 54(a), Federal Rules of Civil Procedure.

So ordered.