Jon EISNER et al., Plaintiffs-Appellees,

v.

STAMFORD BOARD OF EDUCATION: Ursa Coleman, Anna B. Cunningham, Margaret S. Dwyer, Harold E. Hoffman, Theodore P. Jakaboski, Patrick J. Joyce, Ruth A. Linke, Bernard O. Nemoitin and Margaret K. St. John, as members of the Stamford Board of Education, John A. Engel, as Principal of Rippowam High School, and Joseph B. Porter, as Superintendent of Schools of the City of Stamford, Defendants-Appellants.

No. 389, Docket 35345.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1971.

Decided March 5, 1971.

Frederick L. Comley, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn. (Dion W. Moore, Bridgeport, Conn., on the brief), for defendants-appellants.

Monroe Silverman, Stamford, Conn. (Alan H. Levine, New York Civil Liberties Union, New York City, Stephen M. Seelig, Stamford, Conn., of counsel), for plaintiffs-appellees.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The deceptively simple facts in this case generate legal problems which summon up many centuries of political and social thought and action concerning the relation between the rights and powers of men, women, and children, and their government. To resolve this problem we are required to consider principles and concepts which courts have fashioned over several decades of this century, giving concrete effect to the proscription of the first amendment against any law abridging freedom of expression, and apply them to the unique social structure prevailing in a public system of secondary schools.[1]

---

1. The problems raised by this case defy geometric solutions. The best one can hope for is to discern lines of analysis and advance formulations sufficient to bridge past decisions with new facts. One must be satisfied with such present solutions

The Board of Education of the City of Stamford, Connecticut, on November 18, 1969, adopted the following "policy":

"Distribution of Printed or Written Matter

"The Board of Education desires to encourage freedom of expression and creativity by its students subject to the following limitations:

"No person shall distribute any printed or written matter on the grounds of any school or in any school building unless the distribution of such material shall have prior approval by the school administration.

"In granting or denying approval, the following guidelines shall apply.

"No material shall be distributed which, either by its content or by the manner of distribution itself, will interfere with the proper and orderly operation and discipline of the school, will cause violence or disorder, or will constitute an invasion of the rights of others."

Plaintiffs are students at Rippowam High School in Stamford. They wish to distribute free of the restraint imposed by the quoted policy, or of any other similar restraint, a mimeographed newspaper of their own creation and other printed and written literature. The district court agreed with their contention that the Board's policy violates their right to freedom of expression. Limiting the issue to the constitutional validity of the requirement that the *contents* of "the literature be submitted to school officials for approval prior to distribution" (the validity of reasonable regulation concerning time, place, and manner of distribution being conceded by plaintiffs), the court reasoned that the policy imposed a "prior restraint" on student speech and press, invalid under Near v. Minnesota ex rel. Olson, 283 U.S. 697,

51 S.Ct. 625, 75 L.Ed. 1357 (1931), in the absence of even "a scintilla of proof which would justify" the restraint. As an independent ground for granting plaintiffs' and denying defendants' motions for summary judgment, the court found the policy fatally defective for lack of "procedural safeguards," citing Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Specifically, Judge Zampano faulted the policy because it does "not specify the manner of submission, the exact party to whom the material must be submitted, the time within which a decision must be rendered; nor * * * provide for an adversary proceeding of any type or for a right of appeal." The court therefore declared the policy unconstitutional and enjoined defendants from enforcing any requirement that students obtain prior approval before publishing or distributing literature within the Stamford public schools.

We affirm the decision below, 314 F. Supp. 832 (1970), insofar as it declares unconstitutional and enjoins the enforcement of the Board's policy of November 18, 1970, but we do so, as will shortly appear, with some reservations and for reasons significantly different from those advanced by the court below. In sum, we agree that Freedman v. Maryland delineates precisely why the policy here is defective. We do not agree with the district court, however, that reasonable and fair regulations which corrected those defects but nevertheless required prior submission of material for approval, would in all circumtances be an unconstitutional "prior restraint."

I.

Consideration of the judicial interpretations enunciated over the years in this highly complex free speech-press area are a necessary backdrop to our discussion. In *Near*, the Supreme Court struck down a statute which if

and cannot expect a clear view of the terrain beyond the periphery of the immediate case. It is a frustrating process

which does not admit of safe analytic harbors.

analogized to the instant case would place a prior restraint upon distribution of literature by any student who had in the past regularly distributed material deemed by school authorities to be obscene, lewd, and lascivious, or malicious, scandalous, and defamatory. The law held unconstitutional in *Near* permitted such a broad restraint to be imposed by county courts upon publishers of newspapers and periodicals in the state of Minnesota. The Court considered such a scheme to be "of the essence of censorship" and in strong terms, gave expression to the enmity reflected in the first amendment toward "previous restraints upon publication." 283 U.S. at 713, 51 S.Ct. 625. The Court's particular concern was directed at that aspect of the law under which crusading newspaper publishers would hazard not only libel actions, but the utter abatement of their publications and consequently the squelching of their campaigns, if they should attempt systematically to expose the derelictions of public officials. But Chief Justice Hughes made it clear that his opinion was not to be read as invalidating all "previous restraints." He took pains to catalogue several varieties of "exceptional cases" which would justify a "previous restraint." Thus, it was well established then as it is now that "[t]he constitutional guaranty of free speech does not 'protect a man from an injunction against uttering words that may have all the effect of force'." Nor did it question that "the primary requirements of decency may be enforced against obscene publications." 283 U.S. at 716, 51 S.Ct. at 631.

A listing of permissible prior restraints did not have its genesis nor end in *Near*. We are aware of the warning sounded in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957), quoted and put to use by Times Film Corp. v. City of Chicago, 365 U.S. 43, 49, 81 S.Ct. 391, 394, 5 L.Ed.2d 403 (1961), that "[t]he phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." In *Times Film*, the Court instructed that the First Amendment does not guarantee "complete and absolute freedom to exhibit, at least once, any and every kind of motion picture," relying in part on the dictum in Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), that governments may with appropriate measures either punish or prevent the dissemination of "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." The earlier dictum and the holding in *Times Film* were sifted and refined again in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), when the Court laid down three specific procedural safeguards "designed to obviate the dangers of a censorship system," safeguards which we shall shortly discuss in more detail.

The sensitive analysis of the constitutional validity of previous restraints of speech suggested by these cases requires that we address ourselves to the following questions. First, is the Board's policy justified as included within one or more of the categories of exceptional cases to which previous restraints are permissible? Second, is the policy as narrowly drawn as may reasonably be expected so as to advance the social interests that justify it or, to the contrary, does it unduly restrict protected speech, to an extent "greater than is essential to the furtherance of" those interests? See United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In light of *Freedman*, the latter question might usefully be addressed, alternatively, to the substantive and to the procedural aspects of the policy—that is, first to the criteria by which school officials are permitted to bar literature from the school and second to the means by which the bar is to be effected.

## II.

We agree with appellants that we need not and should not concern ourselves with the content or disruptive potential of the specific issue of the newspaper which plaintiffs sought unsuccessfully to distribute on school property. The students are challenging the policy "on its face" and not as applied to their particular publication.

Moreover, we cannot ignore the oft-stressed and carefully worded dictum in the leading precedent, Tinker v. Des Moines School District, 393 U.S. 503, 514, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), that protected speech in public secondary schools may be forbidden if school authorities reasonably "forecast substantial disruption of or material interference with school activities." In an apparent reformulation of that dictum, the *Tinker* Court dissociated its holding that school authorities may not prohibit entirely non-disruptive student speech from cases involving "speech or action that intrudes upon the work of the schools or the rights of other students." 393 U.S. at 508, 89 S.Ct. at 737.[2]

Many cases, following in the choppy waters left by *Tinker*, have applied the quoted language either to validate or to restrain a school's attempt to prevent students from engaging in constitutionally protected activity.[3] Nor need we search far for a theoretical underpinning for the authority of school officials to control disruptive speech, in view of the unassailable power of the state to suppress "words * * * which by their very utterance inflict injury or

tend to incite an immediate breach of the peace." Chaplinsky v. New Hampshire, *supra*, or words which "have all the effect of force." Near v. Minnesota, 283 U.S. at 716, 51 S.Ct. at 631. These phrases have a venerable ancestry, descending from the principle at least as old and as formidable as Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), that "[t]he question in every case is whether the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

The potential "evil," the School Board urges, is the disruption of the effort by the state of Connecticut through its system of public schooling, to give its children "opportunities for growth into free and independent well-developed men and citizens." Prince v. Massachusetts, 321 U.S. 158, 165, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). As the *Tinker* court recognized, it has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials * * * to prescribe and control conduct in the schools." 393 U.S. at 507, 89 S.Ct. at 737. A public school is undoubtedly a "marketplace of ideas." Early involvement in social comment and debate is a good method for future generations of adults to learn intelligent involvement. But we cannot deny that Connecticut has authority to minimize or eliminate influences that would dilute or disrupt the effectiveness of the educational process as the state conceives it. The task of judg-

---

2. *Tinker* upheld the right of public secondary school students to wear black arm bands to school in protest of the Vietnam War, a protest that the majority characterized as "a silent, passive, expression of opinion, unaccompanied by any disorder or disturbance." 393 U.S. at 508, 89 S.Ct. at 737. *Tinker* has been characterized as adopting the view "that the process of education in a democracy must be democratic." Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 159 (1969).

3. E. g., Butts v. Dallas Ind. School Dist., 436 F.2d 728 (filed Jan. 14, 1971, 5th Cir.) ; Scoville v. Board of Educ., 425 F.2d 10, 14 (7th Cir. 1970) (en banc), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970) (school must make "affirmative showing" that it could reasonably forecast "substantial disruption") ; Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970) ; Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969).

ing the actual effects of school policy statements and regulations is a delicate and difficult one. But, to the extent that the Board's policy statement here merely vests school officials under state law with authority which under *Tinker* they may constitutionally exercise, it is on its face unexceptionable.[4] Unless the policy, therefore, purports to delegate greater power to restrain the distribution of disruptive matter than *Tinker* allows, or unless it otherwise unreasonably burdens students' first amendment activity, it is valid.

### III.

The policy criteria by which school authorities may prevent students from distributing literature on school property departs in no significant respect from the similarly very general and broad instruction of *Tinker* itself. Although the policy does not specify that the foreseeable disruption be either "material" or "substantial" as *Tinker* requires, we assume that the Board would never contemplate the futile as well as unconstitutional suppression of matter that would create only an *im*material disturbance. Thus, the regulation tracks the present state of the authoritative constitutional law, and while we realize this does not end the matter it does save the regulation from the charge that it is on its face fatally overbroad, since the policy statement does not purport to authorize suppression of a significant class of protected activity. See Ginsberg v. New York, 390 U.S. 629, 643, 88 S.Ct. 1274, 1282, 20 L.Ed.2d 195 (1968) (statute construed as "virtually identical to the Supreme Court's most recent statement of the elements of obscenity" not overbroad or too vague).

■ Absence of overbreadth, of course, does not in itself absolve the policy statement of the plaintiffs' charge that it is also unduly vague. The phrase "invasion of the rights of others" is not a model of clarity or preciseness. But several factors present here lessen or remove the familiar dangers to first amendment freedoms often associated with vague statutes. Thus, the statement does not attempt to authorize *punishment* of students who publish literature that under the policy may be censored by school officials. If it did, students would be left to guess at their peril the thrust of the policy in a specific case and the resultant chill on first amendment activity might be intolerable. See Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Also, because any ban that school authorities may impose would apply only to students *on school property*, the policy statement does not threaten to foreclose, e. g., from the publisher of a newspaper, a significant market or block of potential buyers should the publisher guess wrongly as to the kind of literature that a school principal will tolerate under particular circumstances. Cf. Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). The policy does not in any way interfere with students' freedom to disseminate and to receive material outside of school property; nor does it threaten to interfere with the predominate responsibility of *parents* for their children's welfare. The statement is, therefore, in many ways narrowly drawn to achieve its permissible purposes, and indeed may fairly be characterized as a regulation of speech, rather than a blanket prior restraint.[5]

---

4. This holding is in accord with the sensible observation in Richards v. Thurston, 424 F.2d 1281, 1282 (1st Cir. 1970), that the Constitution does not condition the exercise of power to prevent disruption of public schools upon the pre-existence of a rule specifically authorizing the particular action taken.

5. Because of such factors as the larger size of university campuses, and the tendency of students to spend a greater portion of their time there, the inhibitive effect of a similar policy statement might be greater on the campus of an institution of higher education than on the premises of a secondary school and the justifications for such a policy might be less compelling in view of the greater maturity of the students there.

In sum, we believe that the Board's policy statement is neither overbroad nor unconstitutionally vague, so far as it prescribes *criteria* by which school officials may prevent the distribution on secondary school property of written or printed matter. See Sill v. Penna. State Univ., 318 F.Supp. 608 (M.D.Pa. filed Sept. 25, 1970), (regulation forbidding activity that "unreasonably" interfered with school "operations" held sufficiently specific).

## IV.

Since, however, the policy statement is in other ways constitutionally deficient, it would not be remiss for us to observe that greater specificity in the statement would be highly desirable. The Board would in no way shackle school administrators if it attempted to confront and resolve in some fashion, prior to court intervention, some of the difficult constitutional issues that will almost inevitably be raised when so broad a rule is applied to particular cases. For example, to what extent and under what circumstances does the Board intend to permit school authorities to suppress criticism of their own actions and policies? See Berkman, Students in Court: Free Speech & the Functions of Schooling in America, 40 Harv.Educ.Rev., 567, 589 (1970); cf. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Similarly, does the Board anticipate that school officials will take reasonable measures to minimize or forestall potential disorder and disruption that might otherwise be generated in reaction to the distribution of controversial or unpopular opinions, before they resort to banishing the ideas from school grounds? See Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).[6] The Board might also undertake to describe the kinds of disruptions and distractions, and their degree, that it contemplates would typically justify censorship, as well as other distractions or disorders that it would consider do not justify suppression of students' attempts to distribute literature. At the same time it would be wise for the Board to consider the areas of school property where it would be appropriate to distribute approved material.

Refinements of the sort we mention would lessen the possibility that the policy statement under attack here because of its tendency to over-generalization, will be administered arbitrarily, erratically, or unfairly, see Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 685, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). By grappling with some of the difficult issues suggested, the Board might also succeed in demonstrating its conscientious intent to formulate policy not only within the outer limits of constitutional permissibility, but also with a sensitivity to some of the teaching reflected in relevant constitutional doctrine and to the

[6] See also Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951); cf. Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Gregory v. City of Chicago, 394 U.S. 111, 117, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J. concurring); Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). The difficult constitutional problems raised by "the heckler's veto," Kalven, The Negro and the First Amendment 140–41 (1965), becomes particularly acute in a public school, where the threshold of disturbance which may justify official intervention is relatively low.

We do not imply by the suggestion in the text to which this footnote is appended, that school authorities must tolerate and indeed protect distribution on secondary school property of the kind of racial or religious slander involved in *Terminiello*. And although it is clear that by appropriate procedures authorities could ban material from school property that would be obscene in the constitutional sense if read by children, see Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), that does not imply that the Constitution protects the distribution on secondary school property of all sexually oriented material. We only mean to recommend that school authorities address themselves to these delicate issues and resolve them administratively before federal courts are called upon to do so.

dangers lurking in improper and unconstitutional administration of a broad and general standard.

Finally, greater specificity might reduce the likelihood of future litigation and thus forestall the possibility that federal courts will be called upon again to intervene in the operation of Stamford's public schools. It is to everyone's advantage that decisions with respect to the operation of local schools be made by local officials. The greater the generosity of the Board in fostering—not merely tolerating—students' free exercise of their constitutional rights, the less likely it will be that local officials will find their rulings subjected to unwieldy constitutional litigation.

### V.

Although the Board's regulation passes muster as authorizing prior restraints, we believe it is constitutionally defective in its lack of procedure for prior *submission* by students for school administration approval, of written material before "distribution." In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965), the Court instructed that strict procedural formalities must be observed whenever a state attempts to enforce a requirement that motion picture exhibitors submit a film to a state board of censors for clearance before the film is shown to the public. In order "to obviate the dangers of a censorship system" the state must:

(1) assume the burden of proving that a film is obscene in the constitutional sense and hence unprotected by the first amendment;

(2) secure a judicial determination of the film's obscenity before it may "impose a valid final restraint"; and

(3) reach a final decision whether to restrain the showing of the film

"within a specified brief period." *Id.* at 58–59, 85 S.Ct. 734.

■ For the reasons we have already set forth, we do not regard the Board's policy as imposing nearly so onerous a "prior restraint" as was involved in *Freedman.* Also, we believe that it would be highly disruptive to the educational process if a secondary school principal were required to take a school newspaper editor to court every time the principal reasonably anticipated disruption and sought to restrain its cause. Thus, we will not require school officials to seek a judicial decree before they may enforce the Board's policy.[7] As for the burden of proof, *Tinker* as well as other federal cases, e. g., Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966), and a companion case cited with approval in *Tinker,* Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), establish that, if students choose to litigate, school authorities must demonstrate a reasonable basis for interference with student speech, and that courts will not rest content with officials' bare allegation that such a basis existed. We believe that this burden is sufficient to satisfy the intent of *Freedman* in the special context of a public secondary school. Of course, this standard is a matter for courts to enforce and need not be reflected in the policy statement.

■ We see no good reason, however, why the Board should not comply with *Freedman* to the extent of ensuring an expeditious review procedure. The policy as presently written is wholly deficient in this respect for it prescribes no period of time in which school officials must decide whether or not to permit distribution. To be valid, the regulation must prescribe a definite brief period within which review of submitted material will be completed.

7. Nor do we find any basis for holding, as the district court suggested, that the school officials must in every instance conduct an adversary proceeding before they may act to prevent disruptions, although the thoroughness of any official investigation may in a particular case influence a court's retrospective perception of the reliability and rationality of officials' fear of disruption.

The policy is also deficient in failing to specify to whom and how material may be submitted for clearance. Absent such specifications, students are unreasonably proscribed by the terms of the policy statement from distributing *any* written material on school property, since the statement leaves them ignorant of clearance procedures. Nor does it provide that the prohibition against distribution without prior approval is to be inoperative until each school has established a screening procedure.

■ Finally, we believe that the proscription against "distributing" written or printed material without prior consent is unconstitutionally vague. We assume that by "distributing" the Board intends something more than one student passing to a fellow student his copy of a general newspaper or magazine. Indeed, this assumption underpins most of our discussion concerning the constitutional validity of the policy statement, apart from the deficiencies we describe here. If students are to be required to secure prior approval before they may pass notes to each other in the hallways or exchange Time, Newsweek or other periodicals among themselves, then the resultant burden on speech might very likely outweigh the very remote possibility that such activities would ever cause disruption. We assume, therefore, that the Board contemplates that it will require prior submission only when there is to be a *substantial* distribution of written material, so that it can reasonably be anticipated that in a significant number of instances there would be a likelihood that the distribution would disrupt school operations. If the Board chooses to redraft its policy in light of what we have said in this opinion, it must make its intentions in this respect clear. Once it does, courts may better evaluate the potential "chill" of the policy on speech. The Board would be wise to be mindful of this danger zone.

For the reasons stated above, we affirm the declaratory judgment by the district court that the Board's policy statement is unenforceable. Because we disagree with the district court's conclusion that under all circumstances, any system for prior submission and restraint would be unconstitutional, the district court must modify its grant of injunctive relief so as to restrain only the enforcement of this particular policy. We therefore affirm and remand the case to the district court for entry of an appropriate judgment in accordance with this opinion.