Fred **BAUGHMAN** as parent and on behalf of Lynne Baughman and Beth Baughman, minors, et al.,

v.

William **FREIENMUTH**, President, Montgomery County Board of Education, et al.

**Civ. A. No. 21484.**

United States District Court,
D. Maryland.

June 7, 1972.

Edward L. Genn, Silver Spring, Md., for plaintiffs.

Robert S. Bourbon, Rockville, Md., for defendants, William Freienmuth, Rosemary Hilberg, Marillyne Allen, Thomas Israel, William Colman, Charles B. Saunders, Jr., Lawrence Wyatt, Homer Elseroad, and Gertrude Bish.

Francis B. Burch, Atty. Gen. of Maryland and Malcolm R. Kitt, Special Asst. Atty. Gen., for defendant, Jerome Frampton, Jr., President on behalf of Maryland State Board of Education.

Charles L. Richards, Silver Spring, Md., for defendants (amicus curiae) John C. Brick, as parent and on behalf of his minor children, Robert Brick and Victor Brick, and Robert H. Cook, as parent and on behalf of his minor children, Kathy Cook and David Cook.

NORTHROP, Chief Judge.

This case was commenced by a complaint and a motion for preliminary and permanent injunctions filed December 3, 1969, by the parent plaintiffs on behalf of the infant plaintiffs, all students in the Montgomery County school system, by which relief was sought against the defendant Montgomery County Board of Education, its members and officers [County Board] and the Maryland State Board of Education. The complaint alleged that certain policies and regulations of the County Board, as set forth in greater detail herein, were violative of the First Amendment rights of the infant plaintiffs in that the regulations unduly restricted, by way of prior restraint, the rights of the students to disseminate non-school sponsored literature on school grounds. The particular piece of literature which the plaintiffs sought to distribute was a so-called "position paper" which criticized the very restriction on dissemination complained of here. The position paper was distributed in violation of the regulations, and a warning letter was mailed to the parents of the offending infant plaintiffs, in which the principal of the Winston Churchill High School, Principal Bish, informed the parents of their children's misbehavior. After the filing of the complaint, the case took a tortuous procedural course, including, *inter alia*: an appeal from this Court's refusal to convene a three-judge court, 325 F.Supp. 1120, which refusal was affirmed by the Fourth Circuit Court of Appeals, 439 F. 2d 796; the contested intervention of certain parents and children opposed to the plaintiffs' position; and action by the State Board to void the Montgomery County rule, but such action was stayed by the State Board pending the outcome of the instant case, thus leaving the original challenged rule in force up to the present time. On May 24, 1972, the case came on for trial on a stipulation of fact. At that time, the plaintiffs' counsel abandoned any demands made in his amended complaint for money damages and attorney's fees, and pressed only his demands for a declaratory judgment and for a permanent injunction against the enforcement of the challenged rules. As a result of a conference in chambers, it appears that the expungement demand in the complaint is not pressed, insofar as the only disciplinary action taken by the defendants against any of the original or additional parties plaintiff was the warning letter sent to the parents of offending plaintiffs by Principal Bish. Consequently, the relief sought at trial amounted to demands for declaratory and injunctive relief, which we grant for the reasons stated below, but the Court wishes to stress at the outset that the relief to which it thinks plaintiffs entitled does not go so far as the relief prayed in their complaint, *viz.*, declaratory and injunctive relief against *any* exercise of prior restraint by the defendants. Rather, the Court is giving its attention only to the constitutional validity *vel non* of the specific regulatory scheme in force at the time of the filing of the complaint and still in force at present. There is no heed, nor is there reason, for this Court to take the drastic step of putting the handcuffs on the Montgomery County School Board and then throwing the key away.

The challenged rule of the County Board is to be found in a 1969 document entitled "A Policy Statement on Student

Involvement in the Educational Process." The rule was carried forward verbatim in the September 20, 1971 re-issue of the Policy Statement, which is currently in effect. The specific challenge of the plaintiffs is directed to that portion of Paragraph 7 of the said document as set forth below:

Under the following procedures, student publications produced without school sponsorship may be distributed in schools:

\* \* \* \* \* \*

d). A copy must be given to the principal for his review. (He may require that the copy be given him up to three school days prior to its general distribution.) If, in the opinion of the principal, the publication contains libelous or obscene language, advocates illegal actions, or is grossly insulting to any group or individual, the principal shall notify the sponsors of the publication that its distribution must stop forthwith or may not be initiated, and state his reasons therefor. The principal may wish to establish a publications review board composed of staff, students, and parents to advise him in such matters.

Students may distribute or display on designated bulletin boards materials from sources outside the school subject to the same procedures that govern student publications.

Plaintiffs also attack the constitutional sufficiency of the "review procedure" established in Paragraph 10 of the same Policy Statement, as amended by the changes thereto in the Policy Statement of September 20, 1971. These "appeal procedures" are so general in nature that it would be useless to set them out at length herein, insofar as they do not purport to relate solely to "appeals" or review involving First Amendment rights, but are, rather, merely directions to the individual schools of the System to set up general review procedures to apply in the framework of disciplinary infractions in general. Apparently, the County Board supplemented these procedures by a document dated May 12, 1972, which, again, is not directed specifically at cases involving First Amendment rights, but provides a vehicle for appealing any decision of the principal of a school to an appellate body, which must render a decision within ten days of the filing of the appeal. Of course, these appellate procedures are not attacked for any reason tied to their inherent insufficiency, but are attacked only insofar as they might constitute a deficient "review procedure" as part of a system of prior restraint.

Of course, the cases in the area of First Amendment rights in the school setting are now so numerous as to defy any attempt at digesting, much less reconciling, them. Indeed, the welter of such cases in which a vociferous child runs right from the schoolhouse door to the courthouse door with his literature in hand has grown in recent years beyond all proper proportion. Were this a case of first impression, this Court would be sorely tempted to refrain from imposing itself upon the school scene. See the excellent opinion of Judge Noel of the Southern District of Texas in Egner v. Texas City Independent School District, 338 F.Supp. 931 (S.D.Tex.1972). Unfortunately, the law in this Circuit is well settled by the recent case of Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971), which, inter alia, held that neither abstention nor exhaustion of state remedies could be required by the District Court as a precondition to the institution of an action such as the present one in which plaintiffs attack the facial constitutionality of a school rule allegedly impeding their rights of free speech. Quarterman goes on to rule upon issues which are almost identical to those posed in the instant case, and it seems to be rather dispositive of those issues. Even though the Court may question the premise upon which Quarterman and its precursors are laid, Quarterman is binding upon this Court and must be followed. Let us, then, review the instant case in light of Quarterman to ascertain whether or not the Montgomery County regulations can

pass the constitutional tests set out in *Quarterman*.

First, it must be noted with some degree of relief that *Quarterman* did *not* hold that all forms of pre-distribution censorship (prior restraint) are prohibited from use by school officials. Indeed, if there were an absolute prohibition upon prior restraint, this Court would find it hard to see how school oficials, already forced by the exigencies of this age of "doing your own thing" to engage in constant exercises in crisis management, could cope with the extra burden of being forced to stand by with tied hands while students bring themselves to the brink of, to say the least, uncivil conduct, and to say the most, disruptive, or even deadly, misconduct. Rather, prior restraint would seem to be permissible within the bounds of *Quarterman* if the regulations governing the imposition of the restraint contain "both . . . criteria to be followed by the school authorities in determining whether to grant or deny permission, and of any procedural safeguards in the form of 'an expeditious review procedure' of the decision of the school authorities." 453 F.2d 54 at 59. Furthermore, *Quarterman* did not hold that school authorities are prohibited from punishing *post factum* those students who persist in constitutionally unprotected activity, and it was even suggested in *Quarterman* that a punishment, not in itself excessive, imposed for the violation of a school regulation, may, in certain circumstances, stand notwithstanding the unconstitutionality of the rule flagrantly violated. *Id.* at 60, n. 11. But more about punishment will be said hereafter.

To get to the substance of the instant case, it is clear that this Court must undertake a two-step analysis of the challenged rule. First, the Court must determine whether or not the rule involved here is so much like that in *Quarterman* that it must perish without further inquiry. If the rule in either its standard-setting or review aspect is not so facially tainted, then the inquiry must be whether it is constitutional or not in light of the standards set forth in the *Quarterman* opinion.

The first step, then, of the analysis here should be to set forth the rule involved (and struck down) in the *Quarterman* case, which is as follows:

Each pupil is specifically prohibited from distributing, while under school jurisdiction, any advertisements, pamphlets, printed material, written material, announcements, or other paraphernalia without the express permission of the principal of the school. 453 F.2d at 55.

Taking up now the first phase of the two-pronged *Quarterman* test, that is, the presence in a rule of prior restraint of "criteria to be followed by the school authorities in determining whether to grant or deny permission," it is clear that the rule involved in the *Quarterman* case was absolutely *devoid* of *any* standard by which the school principal was to be guided in reaching his decision. Such is by no means the case with the Montgomery County rule. On the contrary, the rule sets forth four specific grounds on which the principal may order dissemination withheld. From the wording of the rule, it seems fair to say that its drafters intended it to be subject to the operation of the principle embodied in the maxim "inclusio unius est exclusio alterius," that is, the principal is to withhold permission to disseminate *only if* the publication is tainted by one of the four contaminants set out in the rule, *viz.*, obscenity, libel, advocacy of illegal actions, or gross insult to any group or individual. Now, it seems perfectly clear to this Court that despite the decisions in *Quarterman* and Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the school authorities must retain some residuum of their power to control what happens on school grounds, even if there is some inroad made on completely unbridled free speech. It is clear that *Quarterman* and *Tinker* both allow the school authorities to exert some control, albeit attenuated, over stu-

dent conduct. In *Quarterman*, Judge Russell, speaking for the court, said:

> It is generally held that the constitutional right to free speech of public secondary school students may be modified or curtailed by school regulations "reasonably designed to adjust these rights to the needs of the school environment." [Citation omitted] Specifically, *school authorities may by appropriate regulation, exercise prior restraint* upon publications distributed on school premises during school hours in those special circumstances where they can "reasonably 'forecast substantial disruption of or material interference with school activities'" on account of the distribution of such printed material. If a reasonable basis for such a forecast exists, it is not necessary that the school stay its hand in exercising a power of prior restraint "until disruption actually occurred." [Citations omitted] [453 F. 2d at 58–59]. [Emphasis added.]

■ It is noted in a footnote that the *rationale discussed above also applies* where the printed material is obscene. And in that footnote, reference is made to the standards promulgated by the American Civil Liberties Union on Academic Freedom in Secondary Schools, which, in addition to disallowing the distribution of potentially disruptive material would also allow the imposition of a prior restraint where the material "might be of a libelous nature." 453 F. 2d at 58, n. 9. Consequently, it is clear that the Montgomery County Rule, insofar as it allows the imposition of a prior restraint upon obscene or libelous material is valid.

Now, as to the other two criteria set forth in the Montgomery County Rule, *viz.*, advocacy of illegal action and gross insult to a group or individual, this Court is sorely tempted to declare these provisions valid as guidelines for the exercise of prior restraint. However, because of the extreme breadth of the standards (for example, would advocacy of "civil disobedience" which is so dearly protected by the Courts nowadays be

"advocacy of illegal actions?"), it is doubtful that they could survive the tests quoted above from *Quarterman*. Instead, in order to keep within the pale of permissible restraint, it appears that the guideline with respect to inflammatory material must keep fairly close to the "forecast of disruption" language found in *Quarterman*. Consequently, the rule as it is now articulated cannot stand insofar as the standards relating to advocacy of illegal action and gross insult seem to be too broad under prevailing notions of student rights. These children, it appears, must be allowed to say things right up to the point of actual disruption. The Court does not purport to force any particular formulation of the rule upon the defendants in this case, but perhaps it would be useful to point out that the *Quarterman*, court approved certain language employed in a stay order granted by Judge Craven in connection with the case, the language being that school authorities may prevent distribution of printed material "during classes and at other times and places where such distribution is reasonably thought to be disruptive of normal school activity." 453 F.2d at 56. As to a guideline speaking to the permissible *content* of publications, perhaps a rule drafted on the model of the ACLU rule, cited in footnote 9 of *Quarterman* at 453 F.2d 58–59, would pass the imprimatur of the Fourth Circuit, *viz.*, where the material is such that its distribution "would clearly endanger the health or safety of the students, or clearly and imminently threaten to disrupt the educational process." Of course, the rule may provide for the prior restraint of constitutionally unprotected speech, such as libel and obscenity, as has already been pointed out.

■ Finally, a word or two remains to be said about the type of review procedure required under *Quarterman*. It is clear that the procedure must be "expeditious" inasmuch as we are dealing with the exercise of a prior restraint upon speech, even if it be the speech of children whose brains are yet to be

washed in the waters of maturity and experience. *Quarterman* suggests that the procedure set forth in the case of Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971), at pages 810–811 thereof, would be satisfactory. 453 F.2d at 60. This procedure, as I read *Eisner*, requires:

(1). The specifying of a definite brief period within which review of material will be completed;

(2). The specifying of to whom and how material must be submitted; and

(3). A provision that the prohibition against distribution will not become operative until each school has established its own screening procedure.

In the instant case, it is clear that the Montgomery County rule does not provide a time period within which the principal *must* decide to allow or disallow distribution; rather, it says that a potential distributor must submit prior to the time of distribution, and the principal may require such submission to be made up to three days prior to the scheduled time of distribution. The rule does not say when the principal must make his decision, but it appears to the Court that if the rule were re-worded to say that the principal must make his decision as to allowance or disallowance of distribution within a brief time certain after submission of the material, say, for example, the three days already found in the rule in a different posture, this re-wording would cure the defect. That is, the rule would seem to be all right if it provided, for example, that the principal *shall* decide within three days after first submission whether or not the proposed distribution is to be allowed to proceed.

■  As to the second point of the review procedure as set forth in *Eisner, supra,* it is clear that the Montgomery County rule specifies the principal as the reviewing officer, and this seems perfectly all right. As to the details of the submission, it is clear that no particular method is mandated by the cases, but there should be a provision setting forth how many copies, where, and at what times, etc., the material is to be submitted for screening. And for the third point in *Eisner,* since the Montgomery County Rule is a system-wide rule, there is no danger that its wording and operation *de jure* will vary from school to school, thus rendering the third part of the review procedure set out in *Eisner* inapplicable to the instant case. It will be noted that the Montgomery County rule must fall in light of the requirements of *Eisner* via *Quarterman* because of the absence of a definite short period of time in which the censoring individual must make his decision. *Eisner* did not read Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), as requiring that *school* officials need obtain a judicial decree enforcing their decision to disallow dissemination before the restraint could become operative. So to do "would be highly disruptive to the educational process. . . . ." 440 F.2d at 810. Insofar as *Quarterman* held that the "limited procedural safeguards" as outlined in *Eisner* are all that is required of a rule of prior restraint in a school setting, this Court will impose no burden upon the Montgomery County officials of setting up a judicial, quasi-judicial, or other type of appellate system specifically for the purpose of reviewing school principals' decisions under a rule revised according to the dictates of *Quarterman* as interpreted by this Court. This Court sees no requirement in the cases that any appellate procedure be adopted in the first place. Even if there were a requirement to that effect, it is clear that the May 12, 1972, appeal guidelines give a student aggrieved by a principal's decision a fast and effective appellate procedure. But the Court stresses again that such a procedure is not a requirement such that the absence thereof taints a system of prior restraint. Indeed, it is a sign of the liberality and good faith of the defendants

that they have provided such an appellate procedure *ex mero motu*.

Finally, as to the relief to be given in the instant case, the Court has already pointed out that all prayers for damages and attorneys' fees were abandoned by plaintiffs' counsel in open court. Thus, there remain only the prayers for relief by way of expungement of sanctions from the plaintiffs' records, and declaratory and injunctive relief as to the Montgomery County rule. As far as the expungement is concerned, such relief is not required inasmuch as the County Board, at the very outset of this litigation, agreed to suspend any disciplinary action against the plaintiffs on account of their violation of the questioned rule. Thus, the only sanction involved in the case is not a disciplinary sanction at all, but is merely a letter from Principal Bish to the parents of certain of the plaintiffs. Under the circumstances, the warning letter not being an official letter of reprimand such as would pose a threat to the infant plaintiffs in the future, the Court will not order the County Board to retract the same. Indeed, the question of expungement is no more than academic in this case, but if there had been a serious and permanent disciplinary action, such as suspension, taken against the infant plaintiffs, it is clear that expungement of the said action from the plaintiffs' files would be the proper remedy. *Quarterman, supra*, at 60–61.

As to the declaratory and injunctive relief sought by the plaintiffs, this Court refuses to declare that the Montgomery County Board cannot adopt a rule of prior restraint, so long as the principles of *Quarterman* are properly followed in drafting of the rule; concomitantly, this Court refuses to enjoin the County Board from enforcing, in the future, a rule re-drafted within the parameters of *Quarterman*. The Court specifically rejects plaintiffs' argument, made at trial, that it is impossible for a school board to draft a permissible rule of prior restraint. Were this premise correct, the *Quarterman* case, along with

its fine shadings of what is permitted in such a rule and what is prohibited therein, would be reduced to mere sound and fury, signifying nothing. Indeed, if *Quarterman* stands for anything at all, it stands for the proposition that a rule of prior restraint *may* be imposed if the said rule is properly drafted to avoid constitutional pitfalls. This Court is not about to declare the Montgomery County Board incapable of carrying out this task any more than this Court is about to take over the running of the schools themselves, however much certain elements of the school patron population would like to see that unlikely event come to pass. Indeed, one sometimes gets the feeling in cases such as this that the mouths of the babes are oft times the vehicles by which the parents seek to publicize their pet peeves.

An Order will be entered together with this Opinion granting plaintiffs the relief to which they are entitled.