**Jeff TRACHTMAN, Individually and by his father, Gilbert M. Trachtman, Plaintiffs,**

v.

**Irving ANKER, Individually and in his capacity as Chancellor of New York City Public Schools, et al., Defendants.**

No. 76 Civ. 3845.

United States District Court, S. D. New York.

Dec. 15, 1976.

Berger, Kramer & Sugerman by Martin M. Berger, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel, New York City, by Robert S. Deutsch, Asst. Corp. Counsel, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiffs are a student at Stuyvesant High School (Stuyvesant) in New York City and his father. Student plaintiff Jeff Trachtman, in his capacity as editor-in-chief of the school newspaper, the *Voice,* sought permission from the defendant principal at Stuyvesant and the New York City Board of Education (the Board) to distribute a questionnaire designed to measure the sexual attitudes of his fellow Stuyvesant students. Permission was denied.

Plaintiff now sues for an injunction which would 1) prevent defendants from prohibiting the distribution of the questionnaire throughout the school and 2) prevent defendants from prohibiting publication of an interpretation of the responses to the questionnaire in the *Voice*.[1]

1. A hearing on plaintiff's motion for a preliminary injunction was commenced on September 23, 1976. At that time the court decided to consolidate the motion for preliminary injunc-

The question is whether defendants deprived the student plaintiff of his First Amendment right to freedom of expression when they refused him permission to distribute his questionnaire.[2] The court holds that defendants violated the First Amendment rights of the plaintiff student when they refused permission to distribute the questionnaire to upper class students. The court further holds that defendants cannot refuse permission to publish the results in the school newspaper.

The questionnaire (which is attached hereto as an appendix) is composed of twenty five questions requiring rather personal and frank information about the student's sexual attitudes, preferences, knowledge and experience. Plaintiff seeks to distribute the questionnaire on a random basis. He would then tabulate and interpret the responses for publication in the school newspaper. The identities of those who answer the questionnaire are to be kept strictly confidential. The questionnaire includes a proposed cover letter which describes the nature of the inquiry. It also suggests to the student that if he or she finds the questionnaire disturbing, it should not be answered.

In denying plaintiff permission to distribute the questionnaire, the Board acknowledged the constitutional rights of the students, but stated that student research, especially that which deals with a subject as sensitive as a student's sexual attitudes, must comply with the strict standards contained in a handbook entitled, "Cooperative Procedures Governing Research Proposals— Handbook for Research Applicants." In short, the contention of the Board is that since the questionnaire did not meet these standards and since only professional researchers could handle such a subject with the proper sensitivity, the student request to conduct this study must be denied. It also claimed that some students would suffer irreparable psychological damage upon being confronted with the questionnaire and the necessity to answer certain of the questions.

Plaintiff denies that the study, as planned, could result in harm to some students. He claims that the handbook applies to outside researchers, not expressive activities conducted by the students themselves.

The basic principles governing First Amendment rights of high school students were enunciated by the Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). There the Court said: "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. In can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736. Continuing, the Court noted that it had "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U.S. at 507, 89 S.Ct. at 737. It also ruled that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." 393 U.S. at 508, 89 S.Ct. at 737. Before abridging the First Amendment rights of students, the school authorities must show that restrictions on the expressive activity are

tion with the trial on the merits. Rule 65(a)(2), Fed.R.Civ.P. Thereafter, a trial was scheduled to hear evidence on the question whether distribution of the questionnaire could result in psychological harm to some of the students. The parties later agreed that the court should decide the possible harm question on the basis of affidavits submitted by both sides. The court has now considered those affidavits and the evidence adduced on the hearing of the motion for preliminary injunction and now makes its findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

At this same hearing, the defendants waived their claim for damages of $1000 as to each defendant.

2. The complaint also asked that defendants be enjoined from "employing an unconstitutional system of prior review of literature . . . ." This point was neither argued nor briefed and the court, therefore, does not reach this issue.

"necessary to avoid material and substantial interference with schoolwork or discipline . . . ." 393 U.S. at 511, 89 S.Ct. at 739. The burden of proving that such restrictions are necessary is on the school authorities. *Katz v. McAulay*, 438 F.2d 1058 (2d Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972).

■ Although students do not shed their constitutional rights upon entering school, *Tinker* and subsequent cases make it clear that these rights must be balanced against the duty of the school authorities to maintain discipline and to provide an atmosphere which is conducive to learning. First Amendment rights must be applied in the context within which they are asserted, *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and these rights are not necessarily co-extensive with those of adults. *Baughman v. Freienmuth*, 478 F.2d 1345, 1351 (4th Cir. 1973); *Shanley v. Northeast Ind. School Dist.*, 462 F.2d 960, 969 (5th Cir. 1972).

■ The principles enunciated above have been formulated mainly in the context of student publications and political activities and their potential disruptive effects. The question in this case, however, is markedly different: To what extent will the distribution of a questionnaire dealing with sexual attitudes infringe on the rights of the students and their parents, and what is the potential for psychological harm as a result of the distribution? *Tinker* did not deal with this specific question but focused on the "physically" disruptive effects of students wearing black armbands in opposition to the Viet Nam War. However, *Tinker* did not delineate the circumstances under which the school authorities may proscribe students' First Amendment rights. If defendants can prove there is a strong possibility the distribution of the questionnaire would result in significant psychological harm to members of Stuyvesant High School, then the distribution could be denied. *See Shanley v. Northeast Ind. School Dist.*, 462 F.2d 960, 971 (5th Cir. 1972) (the standard is the "reasonableness" of the restrictions).

At least two cases have dealt with the problem of whether high school students could distribute material dealing with sexual issues. The distribution was allowed in both instances. *Bayer v. Kinzler*, 383 F.Supp. 1164 (E.D.N.Y.1974), *aff'd*, 2 Cir., 515 F.2d 504 (1975); *Burford v. Board of Education of the Baldwin Public Schools, et al.*, Index No. 8482/72 (Sup. Ct. Nassau Co., decided August 16, 1972). This court does not, however, consider either of these cases to have precedential value. Neither dealt with the issue whether a student questionnaire, eliciting very personal and frank information, could have detrimental effects on high school students.

The thrust of defendants' evidence is that serious harm could result if certain students are confronted with particular questions in the survey. It is argued that many high school students are only beginning to develop sexual preferences and that their "identities" are in a state of rapid development. To be asked such pointed questions at this stage in their lives would force those students who are emotionally immature to confront difficult issues prematurely. The result, defendants claim, is that certain students may become quite apprehensive or even unstable as a result of answering this questionnaire. The court finds that this reasoning applies only to students as young as 13 and 14 years of age. Defendants, therefore, did not violate the Constitution in prohibiting distribution at this level.

■ The court does not have the luxury of simply granting or denying the relief requested by plaintiff. When students' First Amendment rights are asserted, the reasonable restrictions which are imposed must be the minimum necessary to protect the need for discipline and to protect the interests of the students. *Grayned v. City of Rockford*, 408 U.S. 104, 116–117, 92 S.Ct.

2294, 33 L.Ed.2d 222 (1972). The relief must be carefully tailored in light of the circumstances of each individual case.

"Free speech under the First Amendment, though available to juveniles and high school students as well as to adults, is not absolute[,] and the extent of its application may properly take into consideration the age or maturity of those to whom it is addressed." *Quarterman v. Byrd*, 453 F.2d 54, 57 (4th Cir. 1971).

■ The court finds defendants' analysis of possible harm to be unconvincing with respect to the junior and senior students. In fact, it appears that such a questionnaire would have substantial beneficial effects. It cannot be denied that New York City high school students are today confronted with an avalanche of explicit sexual information and misinformation. Many a newsstand in the midtown area is the functional equivalent of a pornographic shop. Stuyvesant High School is located on the lower east side of Manhattan. Courses in sex education are taught in the school. Information about sex—both correct and incorrect—is imparted daily on television, on radio and via the rash of new sex magazines about town. With a wry blend of hyperbole and truth, one of plaintiff's affiants asserts that "any youngster sufficiently fragile to suffer serious anxiety or depression upon reading questions which (s)he may ignore with impunity or respond to anonymously, is a youngster too fragile to have survived the trip from home to school." It seems to the court that the distribution of this questionnaire, which is soberly and responsibly written, is an acceptable way in which to have students present sexual issues to other students—free from the debasement of commercialism and sensationalism—and guided by interested parents.

Defendants are concerned that harm will result if the students are directly confront-ed with their own attitudes towards sexual issues (and they certainly will be so confronted if they answer this questionnaire). But it seems that the result of answering this survey is more likely to produce exactly the opposite effect. Upper class students who are sexually immature or who have certain conflicts would be more likely to resolve these problems if they are faced, as a result of peer pressure, with the basic questions, and if they are simultaneously made aware of the fact that many other students have similar problems. The distribution of the questionnaire and the publication of the results in the *Voice* will make it clear that the questions asked are the concerns of many, and that the problems which a student may face are not unique to himself.[3]

In addition to this court's finding that, with respect to the older students, the psychological benefits of the survey far outweigh any harm, there are also significant educational benefits to be gained from this student project. Many of defendants' affiants objected to the unscientific nature of the survey claiming that the questions are a hodge-podge and that the results would prove nothing. This argument is beside the point. The value to the scientific community is not relevant. What is important here is that a number of students took the initiative to research and design a survey with the help of adults. This type of independent investigation should be encouraged and applauded, for an integral goal of our educational system is to stimulate inquiry as well as to impart knowledge. The Second Circuit has stated:

"A public school is undoubtedly a 'marketplace of ideas.' Early involvement in social comment and debate is a good method for future generations of adults to learn intelligent involvement." *Eisner v. Stamford Board of Education*, 440 F.2d 803, 807 (1971).

---

**3.** It is noteworthy that Stuyvesant is a school for intellectually gifted students, who are more likely to respond to the questionnaire with a higher degree of maturity than other students.

The Seventh Circuit has expressed similar sentiments:

"While recognizing the need of effective discipline in operating schools, the law requires that the school rules be related to the state interest in the production of well-trained intellects with constructive critical stances, lest students' imaginations, intellects and wills be unduly stifled or chilled." *Scoville v. Board of Education*, 425 F.2d 10, 14 (1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

This court rejects defendants' argument that, since the study does not conform with the published research handbook of the Board, the student study may be restrained. First, these guidelines, by their own terms, apply only to certain "qualified agencies" and to "candidates for graduate degrees." They were not designed to apply to students. They can not now be brought out of the file and used as a rationale to deny students the opportunity to conduct their own research. Second, while defendants *can* ban the distribution of literature without relying on an existing "rule", *Eisner v. Stamford Board of Education*, 440 F.2d 803, 808 n. 4 (2d Cir. 1971), any such rule must be strictly tailored to protect the constitutional rights of the students. *Eisner, supra.* Unquestionably, the Board can strictly control the in-school research activities of outsiders. *Ellis v. Dixon*, 349 U.S. 458, 75 S.Ct. 850, 99 L.Ed. 1231 (1955); *cf. Katz v. McAulay*, 438 F.2d 1058 (2d Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). But the Board's guidelines are deficient in at least two respects when applied to students. The court sees no reason why students who seek to exercise First Amendment rights need be burdened by the requirement that any survey or research that they carry out conform to certain standards and must employ the proper research methodology. Such a standard would frustrate even the brightest and most curious of students. These students would be limited to designing a proper type of study after endless hours of consultation with someone who is skilled in the complicated area of scientific research.

Another requirement which would impose an undue burden on this type of student expression is the requirement of parental consent before a student is allowed to answer the questionnaire. This requirement would seriously complicate—and perhaps frustrate—the research project of the student plaintiff. Consent forms would have to be distributed, returned and tabulated; curious students may be tempted to forge "stubborn" parents' signatures; the paperwork could lamentably reach adult proportions. The court recognizes that parents have an interest in knowing—and sometimes controlling—what their children learn in school. The court has a responsibility to weigh these concerns when deciding whether certain expressive activities of high school students should be protected when objections are raised by school authorities. The court has not forgotten the interests of the children's parents. However, in view of the arguments already noted and the fact that this research project—though dealing with a very sensitive topic—was designed and written in a highly responsible manner; and in view of the fact that the distribution of the questionnaire must be accomplished in accord with the safeguards described below, this court holds that parental consent is not required under the circumstances of this case before a child in the upper grades can answer plaintiff's survey.

Defendants suggest that the students are free to distribute the questionnaire off of the school grounds. This alternative is not acceptable to the students because it would defeat their attempt to collect a random sample of responses. Distribution and subsequent collection may become too disorganized to achieve any useful results. The court's objection to this alternative is that the various safeguards—which defendants understandably insist are necessary—would be impossible to apply in such a situation. (*See infra*, p. 204). *Cf. Healy v. James*, 408 U.S. 169, 183, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).

■ While the distribution of the survey to students in the 11th and 12th grades should be allowed, the court is not persuaded that younger children will not grow anxious when answering some of the questions on the survey. It also appears that some of these children, who are as young as 13 and 14 years, may be too young and immature to be exposed to a comparison of their sexual attitudes and experience with that of their peers. In view of the numerous affidavits of defendants, we cannot confidently conclude—as we did in the case of the older students—that the distribution of this survey will not result in some significant harm to the youngest children at Stuyvesant. The school authorities certainly need not wait until the harm has occurred before restricting First Amendment rights; they can take reasonable precautions to prevent the possibility of harm. *Butts v. Dallas Ind. School Dist.*, 436 F.2d 728, 731 (5th Cir. 1971). The Board, therefore, may continue to deny plaintiffs permission to distribute the questionnaire to the 9th and 10th grade students.

■ The distribution of the survey should be allowed in grades 11 and 12, but certain safeguards requested by the school authorities should definitely guide this distribution. The court feels that the details of the distribution should be worked out through negotiations of the interested parties. The court is quite unfamiliar with the special needs and structure of Stuyvesant. And the courts, as a general rule, should minimize their involvement in the day to day business of our schools. *Healy v. James*, 408 U.S. 169, 195, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (Chief Justice Burger concurring); *Shanley v. Northeast Ind. School District*, 462 F.2d 960, 967 (5th Cir. 1972).

■ The inexpertise of the court is only one reason why it should limit its involvement in Stuyvesant's business. The students and the school authorities should be encouraged to come to mutual agreements free of the outside pressure of the legal system. There should be no losers or winners when students and school officials disagree for, presumably, all concerned are interested in promoting the common goal of educating our children. The relationship should not become adversarial. It should be one of accommodation and understanding. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 593–4, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (Mr. Justice Powell dissenting).

The parties should, therefore, agree on a plan by which to distribute, collect and publish the survey in light of the following elements:

1. The negotiators shall be chosen by the respective parties and shall include a student representative, a parent representative chosen by the students, the principal (or his representative) of Stuyvesant, and a representative of the Board of Education (who may delegate his authority to the principal).

2. The negotiators shall select a member of the Stuyvesant faculty or administration—acceptable to the students—who will take the responsibility for seeing that the distribution, collection and publication of the survey are performed in accordance with the final plan.

3. Provision should be made for both confidential and public discussion groups for students who would like to talk with school personnel after the distribution of the survey and the publication of the results in the *Voice*.

4. A written description of this plan (if a plan is agreed upon) shall be submitted to the court on or before December 30, 1976.

5. A hearing on the proposed plan will be held on January 5, 1977. It is to be attended by those who negotiated this agreement as well as the parties' counsel. If no agreement has previously been reached, the court will draw its own plan. If an acceptable plan has previously been submitted, this hearing may be cancelled.

Appendix to follow.

## APPENDIX

The Stuyvesant Voice

### "SEXUALITY IN STUYVESANT"
Robert Marks

Mr. Fabbricante, Principal.                                    Mr. Pearlman, Faculty Advisor

Dear Participant,

The following is a survey for an article being written for the Stuyvesant Voice. The topic is "Sexuality in Stuyvesant". In this case, "sexuality" covers a wide area from human equality to sexual education.

Sexuality plays a very important role in society—far more important than many people realize. It affects every human encounter, every interplay and its effect is no weaker in Stuyvesant than anywhere else. With the help of this survey, I will attempt to draw some conclusions and interpretations concerning the influence of sexuality on the Stuyvesant community.

The questions asked are direct and personal. The survey is random and completely confidential. No one will know who has filled out your specific survey except you. Because of the strict precautions that are being taken to make all answers confidential, I am hoping that you will be as honest, open and responsible as possible when answering the questions. You are not required to answer any of the questions and if you feel particularly uncomfortable—don't push yourself. Any additional information that you feel is pertinent is more than welcome and extra space is provided for these comments.

The article itself, is a personal study of attitudes and ideas. It will contain some statistics, but only enough to demonstrate similarities and differences among the surveyed Stuyvesantians. But, to a greater extent, it will be a human article expressing human feelings on an underplayed and extremely important part of our lives.

Please consider your answers carefully. This survey comprises the bulk of the research for the article. Honesty and responsibility cannot be stressed enough.

Your cooperation is greatly appreciated. Thank you.

Sincerely yours,

Robert A. Marks

Robert A. Marks

Questionnaire—"Sexuality in Stuyvesant"

Stuyvesant VOICE

1) Sex:                                              2) Grade:

3) What is your definition of sexuality?

4) Is the atmosphere different (in respect to sexuality) at Stuyvesant as opposed to your old school? Drastically _____ Little _____ Not at all _____.

Did you have trouble adjusting? Greatly _____ Somewhat _____ Not at all _____.

Comments?

5) Does sexual profanity offend you?  Yes _____    No _____.

Comments?

6) What are your attitudes towards the traditional dating situation?  eg. Only *boy* can ask *girl* out?  Boy pays for date?

7) Are men equal to women?  Totally _____    In most cases _____    Never _____.

Comments?

8) To what degree should unisexuality be carried?  (It has been haircuts and clothing up to now, it could one day be bathrooms.  How do you feel?)

9) Do sexual stereotypes exist?  If yes, which do you feel most strongly about?

10)  Do you feel the institution of marriage is outdated?
Greatly _____   Somewhat _____   Not at all _____.

Can you think of any alternatives?

11) Do you approve of pre-marital sexual relations?
Greatly disapprove _____   Some reservations _____   Approve _____.

Comments?

12) Do you approve of contraception?
Greatly disapprove _____   Some reservations _____   Approve _____.

Comments?

13) What types of contraception are you aware of?  What types would you use?

14) How would you react to homosexuality if it occured among your peers?
Extremely uncomfortable _____   Uncomfortable _____   Slightly Uncomfortable _____
Comfortable _____.

Comments?

15) Do you consider yourself a heterosexual _____, homosexual _____ or a bisexual _____?

Comments?

16) What are your feelings on homosexuality?  Bisexuality?

17) Would you object to a homosexual or a bisexual in a position of authority?
Greatly _____   Somewhat _____   Not at all _____ .

Comments?

18) What are your feelings on the topic of masturbation?  Can it hurt the body?  the mind?

19) What are your feelings on abortion?  Would you conceiveably have one yourself?

20) What is the extent of your sexual experience?  Was this experience (whatever it may be) what you expected it to be?

21) Do you feel an emotional relationship must coexist with a sexual one?  (or vis [sic] versa)
Yes _____   No _____ .

Comments?

22) Where did most of your sexual education take place?
In my home _____   In school _____   Among my peers _____   Other _____ .

Comments?

23) Do you feel your views on sexuality coincide with those of your parents?  Do you get along with your parents?  In what ways do their opinions agee [sic] or differ with yours?

24) Do you feel that your sexual education (emotional and factual) is complete?  Are there or have there been deficiencies?  Is it the school's job to correct this deficiency?  Are you satisfied with the situation?

25) Do you feel a change to more liberal attitudes in respect to the topics discussed in this questionnaire, on the part of the society, would be good or bad?  Why?

Comments on other areas not mentioned in this questionnaire would be greatly appreciated.  You may also expand on any of the questions that were included.  Finally, please include some feedback on the questionnaire itself.

Thank you for your cooperation.